**[J-84-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 810 CAP |
| | : | |
| Appellee | : | Appeal from the Order of the Court |
| | : | of Common Pleas of Adams County, |
| | : | Criminal Division, entered on July 3, |
| v. | : | 2023, at No. CP-01-CR-0001180- |
| | : | 2010. |
| | : | |
| CHRISTOPHER LYNN JOHNSON, | : | SUBMITTED: September 25, 2024 |
| | : | |
| Appellant | : | |


**OPINION**


JUSTICE DOUGHERTY                              **DECIDED: May 19, 2025**

Appellant Christopher Lynn Johnson appeals from the order of the Court of Common Pleas of Adams County denying his petition for relief from his death sentence, filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§9541–9546. For the reasons set forth below, we affirm.

**I. Background**

**A. Facts**

This Court provided a detailed recitation of the facts leading to appellant's convictions in our opinion on direct appeal affirming his sentence of death. We reproduce those facts here.

> The record reveals that on the night of November 11, 2010, Officer David Grove, a Deputy Wildlife Conservation Officer of the Pennsylvania Game Commission, was patrolling the area near Gettysburg National Military Park in Freedom Township, Adams County when he informed [the] Adams County 911 center at 10:32 p.m. that he had encountered a vehicle "spotlighting" just across from the Battlefield. According to the 911 operator

who testified at trial, Officer Grove reported seconds before 10:34 p.m. that he was prepared to stop the vehicle. At just after 10:35 p.m., he transmitted the license plate number of the stopped pick-up truck, which was registered to appellant. At just before 10:37 p.m., Officer Grove stated that the driver and passenger were out of the pickup truck and he was awaiting assistance before proceeding further.

The next transmission the 911 center would receive came from responding Officer Daniel Barbagello, who, at seconds before 10:39 p.m., called "officer down, officer down." Officer Barbagello detected no pulse when he examined Officer Grove, who had been shot three times, including a fatal shot to the back of the neck.

For the six hours leading up to that tragic shooting, 27[-]year-old appellant and his 19[-]year-old friend Ryan Laumann had been drinking beer and driving appellant's pick-up truck in the area looking for deer to shoot. Earlier that afternoon, Laumann had returned home from work at about 4:00 p.m. to find appellant waiting there with the odor of an alcohol called "99 Bananas" on his breath. Laumann perceived appellant to be "walking fine, talking fine," though he "seemed to be maybe a little tipsy like buzzed a little bit. He was kind of giggly, more or less just kind of giggled at the smallest little things a little bit." Laumann, a licensed hunter, brought his compound bow with him and rode passenger as appellant drove capably, in Laumann's opinion, for the approximately five[-]minute drive to [appellant's] hunting cabin off Orrtanna Road.

After drinking a beer or two, the two men shot Laumann's compound bow, and appellant's crossbow and .22 long rifle with a scope to make sure they were still "sighted in." They walked along the tree line and climbed up into their tree stand, a three[-]to[-]four[-]foot wide landing accessible by an 18–step, leaning metal ladder. Laumann carried his compound bow up the ladder while appellant made his way up the ladder carrying his crossbow without any problem. The two sat on the tree stand until dark without any safety restraints, drank beer, and watched for deer. Over the course of their time there, Laumann saw appellant drink six or seven cans from a 12–pack of Bud Light while he had two or three. Another source of beer available that night was a small stock of cans kept in the creek, though Laumann did not state definitively whether appellant drank any from that stock. Laumann was "pretty sure," but not certain, that all empties were thrown into the bed of the pick-up truck. At dark, the men climbed down from the tree stand and walked back to the cabin, and again, Laumann saw nothing about appellant to indicate he was having difficulty with his balance. Other than the moment appellant quickly went back into the cabin before boarding the pick-up and leaving, the two men were together the entire time.

Appellant drove the two to Ross Orchard, where they began spotlighting for deer. Appellant had no problem negotiating the orchard's roads, which

Laumann described as "just little dirt lanes wide enough for a vehicle" and "a little bumpy from time to time[,]" with one hand on the wheel while simultaneously holding a spotlight out the driver's side window with the other, Laumann testified. The two spotted a number of deer without any attempt to hunt, and then left the orchard. They drove along local roads, turning frequently, went across a bridge, down a stone lane, and across a creek until they arrived at Red Rock Road. Laumann witnessed appellant drink "a few" more beers from the Bud Light 12–pack during this time, but noted that appellant negotiated a stretch of road where the two had gotten stuck only ten days earlier.

Appellant stopped the pick-up when his spotlight shone upon a doe. He leaned out the window and over the roof and continued to aim the light directly on a doe positioned 20 to 25 yards away in a field along the passenger side as Laumann registered a strike just behind the deer's left shoulder with his compound bow. The two did not retrieve the deer, opting instead to give it time to die. Appellant drove further along Red Rock Road about a few hundred yards when he spotted a deer in a field on the driver's side. Saying he wanted the deer, he backed up into a driveway to change directions on Red Rock Road. He regained sight of the deer and shone a light on it while Laumann pointed the .22 long rifle outside the passenger side window and fired, but he missed. Appellant grabbed the rifle from his position in the driver's seat and leaned across the console to poke his body out the passenger window while still holding the spotlight with his left hand. He then braced the rifle between his right arm and torso and fired twice at the deer, causing it to stumble and fall. On cross[-]examination, Laumann confirmed that appellant, whom he described as an "average shot," would have used his right hand to pull the trigger, swing the oval lever beneath the trigger down to discharge the shell and back up to load the next shell into place, and then pull the trigger to take the second shot.

Appellant drove off, leaving the deer for later retrieval, and turned down nearby Schriver Road when he and Laumann noticed headlights appear from behind. Laumann said he believed it was "DNR" [a presumptive reference to the Pennsylvania Department of Conservation and Natural Resources] and appellant replied "Do you think?" as they saw blue and red overhead lights activated. Appellant continued to drive around a bend and pulled over alongside the road near pine trees and roadside brush. On cross-examination, Laumann insisted appellant pulled over immediately, at the first safe opportunity, upon seeing the overhead lights.

Before their encounter with Officer Grove would begin, Laumann worried aloud that they were in "a lot of trouble" for shooting the deer, to which appellant replied "[d]on't worry, I got you, but I'm not going back to jail." Appellant said this in a "normal tone like he was being serious, but [Laumann] did not take it as threatening . . . like he was going to harm anybody."

They remained seated as Officer Grove addressed them by loudspeaker from his patrol SUV. He ordered appellant to turn off the engine and drop the keys out of the driver's side window, and appellant complied. Officer Grove then directed appellant to lean his arm outside the driver's side window, open the driver's side door using the exterior handle, step outside the vehicle, close the door, and stand with his hands atop the vehicle. Again, appellant complied.

When Officer Grove asked if there were any passengers in the vehicle, appellant nodded, and Officer Grove gave Laumann the same instructions for exiting and placing his hands on the vehicle alongside appellant. After ordering the men to remain still at that time, Officer Grove remained in his vehicle for about one minute. He asked if there were weapons in the car and, if so, where, and [a]ppellant answered there were weapons in the back seat of the cab.

It was at this time appellant whispered to Laumann that he had a .45 on his side. Laumann warned there was nothing he could do about it and that it would be discovered and taken away. Officer Grove then ordered appellant to place his hands on his head and walk backwards towards the patrol car. Appellant was able to comply. Officer Grove approached appellant and placed a handcuff on him, prompting appellant to yell "What did I do? Why am I being arrested?" Officer Grove gave no answer and appellant began to resist. Officer Grove's voice rose, Laumann testified, as he issued four or five commands during the struggle for appellant to get down on the ground. The next thing Laumann heard was the sound of gunshots, and Laumann dropped to the ground behind the truck and lost sight of the encounter. When he peeked for a second, Laumann saw appellant standing in a backward leaning posture and firing at least three more shots in rapid succession with the gun in his right hand and right arm fully extended. Laumann screamed appellant's name and then everything went silent.

When Laumann looked up, he saw appellant rise from a lying position, run for his truck, and stumble and fall while yelling "I'm hit, I'm hit." Appellant reached around on the ground near the driver's side of his vehicle and found his keys where he discarded them minutes before as instructed. Laumann stood up and was ordered by appellant to get in the pick-up. Laumann then looked over at the patrol vehicle and could see Officer Grove lying with his head facing the rear tires and his legs pointed to the middle of the road. Laumann boarded the pick-up and appellant started the engine, put it in drive, and sped off.

Leaving the scene at between 60 to 80 miles per hour, [a]ppellant made numerous turns and navigated the "real narrow . . . bumpy and real windy" pathways he had earlier used to get to Red Rock Road. As appellant drove

in this manner, Laumann observed him open the center console and reach around to grab what Laumann believed to be a clip for his .45, which already lay on his lap as he drove. Laumann believed it to be a clip because appellant thereafter leaned forward over his lap and Laumann heard the "click like a snap noise" as when a clip gets pushed into a handgun. Laumann kept telling appellant that he wanted to get out of the pick-up, and about four to five minutes into his flight, appellant stopped at a rural stop sign and allowed Laumann to grab his belongings and get out of the vehicle.

Hours later, Laumann denied knowledge of the incident when investigators visited his house, saying that appellant had dropped him off at his girlfriend's house at 6:30 p.m. He recanted his false statement the following morning, however, and provided investigators with a full eyewitness report of the crime, although he withheld an admission to his having killed a deer with his bow and fired at another deer with a .22 rifle until just two weeks before trial.

When asked at appellant's capital trial whether he believed appellant was drunk at any time during the events of November 11, 2010, Laumann answered "no." Appellant seemed "normal" and caused Laumann no concerns while he drove throughout the evening, he said. "There were times he kind of giggled a little bit. That's when I took it that maybe he was tipsy. Like I wouldn't consider him drunk, but he was feeling the alcohol."

Later in his testimony, he elaborated that, to him, tipsy and buzzed meant halfway between sober and drunk. He also stated he was not strictly counting the number of beers appellant drank and that six or seven was a "rough estimate." Laumann reiterated that while he saw appellant pull the clear bag of full beer cans out of the creek to check on them, he never saw appellant pull a beer out of the bag.

The following morning, at approximately 9:30 a.m., Edmund Miller was driving along Bingham Road in Franklin Township in his work capacity on what he described as a cool but sunny and pleasant day when he spotted appellant limping along the side of the road. Not knowing appellant, Miller nevertheless stopped and asked if he needed a ride, but appellant acted "aloof" and did not seem to want one. Miller said "you look like you're hurt," and appellant then accepted his invitation for a ride. Appellant gave his destination and directed Miller as they drove. When Miller asked why appellant was limping, appellant explained he had slipped on a rock up in the hills. Miller drove the approximately two miles toward appellant's Orrtanna Road hunting cabin, and as he turned onto Orrtanna Road, he could see police cars ahead. About ten police officers converged on his truck when he stopped in the dirt lane leading to the cabin, Miller said, and appellant did "nothing." "He just wanted [me to turn] in the lane" and drop him off, and said he would walk the rest of the way, Miller testified. Appellant then got out of the truck of his own accord.

Officers immediately secured appellant on the ground with his hands cuffed behind his back. Armed officers backed away from appellant as Pennsylvania State Trooper Neal Navitsky of the Fugitive Apprehension Unit approached to read *Miranda* warnings to appellant. After rolling appellant on his side to confirm his identity and rule out a possible gunshot wound to the abdomen, Trooper Navitsky crouched down to eye level with appellant and explained to him the extreme importance of what was about to be read to him, that if he had questions he needed to interrupt and ask, and that he must maintain eye contact so the trooper would know he was being attentive. Appellant acknowledged that he understood Trooper Navitsky's instructions and maintained eye contact throughout *Miranda* warnings. When Trooper Navitsky asked him if he understood the rights that were just explained, appellant acknowledged that he did. Asked "[w]ith these rights in mind do you wish to talk with us?" appellant again answered in the affirmative.

When asked what brought everyone here to this point, appellant replied that he had made some bad decisions. Adams County Detective Frank Donnelly then asked appellant if he realized he shot a police officer last night. According to Trooper Navitsky, appellant replied he "didn't shoot a police officer. He was just a game warden." Appellant then attempted to clarify his remark by saying he was simply noting the distinction between a police officer and a game warden.

Trooper Navitsky redirected the conversation back to the previous night, and appellant described the entire sequence of events leading up to the shooting, specifically: he and Laumann had poached a deer at night; they drove off but saw red and blue lights appear from behind and pulled over for a vehicle stop; they were ordered to exit their vehicle and place their hands on his truck; he "got to thinking" of the .45 caliber handgun on his waistband because he was prohibited as an ex-felon from possessing it, and contemplated removing it and kicking it under his truck to hide it from Officer Grove's detection; he complied with orders to walk backwards towards Officer Grove; he "panicked" when Officer Grove placed a handcuff on his right hand, pulled it away and drew his .45 with the left hand. When asked how he managed to grab the gun, he explained that, while using his body to block Officer Grove's sightline to the gun, he used his left hand to manipulate the release on the holster, draw the gun, and transfer it to his right hand to begin firing. He and Officer Grove exchanged gunfire, appellant reported, and afterward he retreated to his vehicle and drove away without checking on Officer Grove's condition.

Appellant said he drove up to a road off of Teaberry and Mountain Cold Springs Road, parked his truck, and began traveling by foot. He ascended a steep slope in the woods until he reached a high peak, and threw his .45 handgun down one side of the peak and threw his holster down the other side. He attempted to treat the gunshot wound to his hip by cinching his

leather belt to act as a tourniquet, he said, to provide compression to the wound.

During this initial ten[-]minute interview, Trooper Navitsky found appellant's answers "very much" responsive to the questions being put to him. Appellant did not simply answer "yes" or "no," but, instead provided detailed answers demonstrating an understanding of the questions asked, the trooper stated. Notably, Trooper Navitsky testified, appellant gave no indication of experiencing pain or discomfort during the interview. He maintained eye contact throughout and, it appeared to Trooper Navitsky in his experience, spoke in an unguarded manner consistent with the giving of truthful answers.

Trooper Navitsky paused the interview when EMTs arrived to treat and transport appellant to a hospital. He gained access to a voice recorder in the meantime, and he and another fully uniformed trooper waited about ten minutes while EMTs prepared appellant. They eventually boarded the ambulance with three EMTs and appellant to resume the interview. Once inside, Trooper Navitsky began recording and held the recorder in front of appellant where he could see it.

Portions of the recording were played at trial. At the outset, appellant can be heard saying "ouch, ouch, ouch[,]" which Trooper Navitsky attributed to appellant's being placed on his back on the litter causing him to lie directly on his cuffed wrists. The troopers removed the cuffs, repositioned appellant's arms to the front of his body, and cuffed each hand to the nearest siderail of the stretcher for comfort, giving appellant about six or eight inches of mobility with each arm.

At that point, Trooper Navitsky noticed the EMT preparing to administer morphine to appellant. He can be heard on the tape asking if he could have five minutes to record appellant's statement before the morphine was administered, and the EMT answered "that's fine."

Trooper Navitsky witnessed no change in appellant's mental status during the course of his interrogation. "He was very coherent. He was calm. He was attentive. He was being respectful and polite and he was answering my questions accordingly and expounding on his answers[,]" Trooper Navitsky testified. The recorded statement began with the question: "Before we spoke, did I read you something?" and the answer was "Yeah, *Miranda* rights." Appellant confirmed he knew what *Miranda* rights were and denied having any illegal drugs in his system. When asked how many beers he had drunk, appellant answered "two to three."

Appellant acknowledged having possessed the .45 handgun for three years, starting shortly after his release from prison. He answered questions about the silhouette targets observed at his cabin and took credit for the

closest grouping of three bullet holes, attributing his accuracy from 35 yards out to having taken a "normal" stance instead of turning the gun sideways, which he had apparently done on his other practice shots. Appellant also took credit for shooting the deer on Red Rock Road, saying he was pretty sure his shot hit its mark, and thought the deer was a mechanical decoy at first like the kind he said he had seen on Iron Springs Road because it had not moved after the first shot. When asked about the holstered .45 on his left hip, appellant explained that the holster was a Blackhawk brand, angled on the left hip to allow the gun to go straight into the right hand reaching across and designed to require the push of a release button before one draws so the gun won't fall.

The next portion of the recorded interview involved Trooper Navitsky noting appellant's request to turn the tape recorder off so he could address a topic off the record. Trooper Navitsky later explained at trial that appellant wished to advise the trooper of Ryan Laumann's participation in the poaching of a deer the night before.

Trooper Navitsky confirmed on cross-examination that appellant's initial statement and his recorded statement were essentially identical. Nowhere in either statement, the trooper testified, did appellant explicitly admit that he attempted to shoot directly at or kill Officer Grove.

Doctor Kern Michael Hughes, York Hospital staff trauma surgeon testified that at about 11:00 a.m. on the morning of November 12, 2010, appellant was brought to his trauma unit for the possibility of a serious gun-related injury. His vital signs were normal and, after taking a personal history, conducting a physical exam and reviewing both a chest x-ray, and CT scan of appellant's abdomen and pelvis, Doctor Hughes determined the bullet wound in appellant's hip was confined to the superficial regions of the hip. This "flesh wound" as Dr. Hughes called it in layman's terms required no surgical intervention, and was treated with antibiotics and a dressing. Dr. Hughes' notes, furthermore, described appellant as alert and oriented during his examination.

As he does with all trauma patients due to concern of blood loss, Dr. Hughes continued, he sought to rule out hypothermia during his physical examination and laboratory testing of appellant. Appellant did not present with hypothermia, even with his exposure to the cool night, and so he excluded it as a concern. On cross-examination, Dr. Hughes acknowledged that the hour-long ride in a heated ambulance while receiving a 100 milliliter warm bolus IV would have affected appellant's hydration and body temperature to some degree, bearing on the issue of hypothermia and dehydration. Appellant did complain of pain to Dr. Hughes. Pain is a very subjective thing, Dr. Hughes explained, and so appellant was medicated in accordance to his complaint.

The Commonwealth charged appellant with one count of first[-]degree murder and related offenses and gave him notice of the aggravating circumstances it intended to pursue in the event he was convicted on the main charge. The trial court thereafter denied appellant's omnibus pretrial motion to quash all but one aggravating circumstance[] and to suppress his statements to police, the latter motion being denied following a hearing. The court did grant appellant's motion for a change of venire, and a jury was selected in Lancaster County.

*Commonwealth v. Johnson*, 107 A.3d 52, 59-65 (Pa. 2014) (*Johnson I*) (opinion announcing judgment of court) (internal footnotes, citations, and some capitalization omitted).[1]

## B. Jury Selection and Guilt Phase

Jury selection for appellant's capital trial began with prospective jurors from Lancaster County before the Honorable Michael A. George of the Adams County Court of Common Pleas on August 27, 2012. During jury selection, the Commonwealth used a peremptory challenge on Juror 177 and, after a sidebar discussion, trial counsel[2] asked for the Commonwealth's reasoning for the peremptory challenge. The Commonwealth explained it chose to strike Juror 177 because he was untruthful when stating he had no criminal record on his juror questionnaire. In fact, the Commonwealth explained, Juror 177 recently committed a non-traffic offense and had a series of driving under suspension offenses on his record. The trial court allowed the peremptory challenge to be exercised.

---

[1] *Johnson I* was authored by Justice Stevens and joined in full by Chief Justice Castille and Justice Eakin. Then-Justice Baer authored a concurring and dissenting opinion, joined by then-Justice, now Chief Justice Todd, joining the majority opinion except for its rejection of appellant's "claim of trial court error in denying his motion to quash the aggravating circumstance that he killed while in 'perpetration of a felony' under 42 Pa.C.S. §9711(d)(6), when his underlying felony conviction contemporaneous with the murder was for unlawfully possessing a firearm." *Johnson I*, 107 A.3d at 99-100 (Baer, J., concurring and dissenting). Then-Justice Saylor also joined the majority in large part but concurred only in the result in certain respects, none of which are relevant here. *See id.* at 98-99 (Saylor, J., concurring).

[2] Appellant was represented by Kristin Rice, Esq., and William Miele, Esq., during both the guilt and penalty phases of his trial. References to trial counsel refer to these attorneys collectively. When referring to these attorneys individually, we do so by name.

After attempting to clarify the Commonwealth checked that the criminal record belonged to Juror 177, trial counsel objected. Trial counsel explained the objection was to whether the Commonwealth had enough information to be certain the criminal record belonged to Juror 177. Juror 177 was then dismissed over trial counsel's objection.

Following the selection of the jury, the Commonwealth, over multiple days, presented testimony and evidence establishing the above-described facts. Additionally, and as relevant to this appeal, trial counsel presented the testimony of the following individuals in defense of appellant: 1) expert toxicologist Dr. Lawrence Guzzardi, who opined appellant's blood alcohol content was between .15 and .22 at the time of the shooting, possibly resulting in the loss of faculties and the inability to form the specific intent to kill; 2) appellant's then-fiancé Leslie Filer, who testified appellant was slurring his words by noon on the day of Officer Grove's death; 3) expert ophthalmologist John Bullock, who testified appellant's vision would have been blurred by headlights and emergency lights and this effect would have been compounded by intoxication; and 4) emergency physician Dr. Fazila Lalani, who treated appellant after Officer Grove's death and testified appellant told him he drank twelve beers that day.

The trial court's closing charge to the jury included the following instruction on voluntary intoxication:

> Generally speaking, a person who voluntarily uses intoxicants, that is alcohol, is not allowed to claim as a defense that he or she was so intoxicated that they were legally incapable of committing a crime. Nor is a person allowed to rely upon evidence of his intoxication to prove that he or she lacked an intent, knowledge, or other mental state required to prove a particular crime.
>
> These general rules, however, do not apply to the charge of first[-]degree murder. The [d]efendant is permitted to claim as a defense that he was so overpowered by intoxication or intoxicants, alcohol, that he had lost control of his faculties, that he was unable to understand the nature and quality of his acts or to distinguish between right and wrong with respect to those acts. In other words, either unable to know what he was doing or to judge that it was wrong. Thus, lacking the specific intent to kill.

The Commonwealth has the burden of disproving this defense. Thus, you cannot find the [d]efendant guilty of first[-]degree murder unless you are satisfied beyond a reasonable doubt that the [d]efendant, despite any intoxicated condition was at the time incapable of forming the specific intent to kill and did in fact form that intent.

Voluntary intoxication may reduce murder of the first degree to murder of third degree, but no lower. A defendant may also not use his own voluntary intoxication in any way to defend himself against the other charges, including the charge of third[-]degree murder or the other charges which I will identify for you.

N.T. Trial, 10/2/12, at 1348-50. Trial counsel did not object to this instruction. Ultimately, the jury convicted appellant of first-degree murder, persons not to possess firearms, carrying a firearm without a license, and possessing an instrument of crime. *See* 18 Pa.C.S. §§2502, 6105, 6106, 907.

### C. Penalty Phase

The case then proceeded to the penalty phase to determine whether appellant would be sentenced to death or life in prison without the possibility of parole. The Commonwealth sought the death penalty by way of four aggravating factors: the victim was a law enforcement officer, 42 Pa.C.S. §9711(d)(1); the victim was a prosecution witness killed for the purpose of preventing his testimony, *id.* at §9711(d)(5); the killing occurred while in the perpetration of a felony, *id.* at §9711(d)(6); and appellant had a significant history of felony convictions involving the use or threat of violence to the person, *id.* at §9711(d)(9). Meanwhile, the defense sought application of three mitigating factors: appellant was under extreme mental or emotional disturbance, *id.* at §9711(e)(2); the capacity of appellant to appreciate the criminality of his conduct or to confirm his conduct to the requirements of law was substantially impaired, *id.* at §9711(e)(3); and the catchall mitigator, *id.* at §9711(e)(8).

The Commonwealth presented the testimony of several witnesses during the penalty phase, including James Bievenour, Patrick Redding, and Pennsylvania State

Trooper Curtis Whitmoyer, all of whom testified regarding a burglary of firearms from a hardware store committed by appellant in 2002. The Commonwealth also presented victim impact evidence during the penalty phase from Officer Grove's mother and father, Lucy and Dana Grove, and his girlfriend, Angela Heare. In particular, Mr. Grove testified regarding the funeral arrangements and services for Officer Grove, stating the funeral director told him there would be "thousands of people coming" and explaining how "it was such a monumental task to arrange this, but through all the law enforcement communities and Game Commission they made things a lot easier, but it was still so overwhelming." N.T. Penalty Phase Hearing, 10/3/12, at 1459. Mr. Grove also recounted the following story:

> I remember to this day that there was a mother and a little red-head 12-year-old boy came through and she wanted to share a story with us and she said that, I wanted to tell you what your son, David, meant to my son, and what happened is when this young boy who was taking his hunter trapper education course, at the end you got to get a percentage to continue on to get your hunter trapper education card so you can get your license and I remember for whatever reason he didn't get the right amount he needed for that, so David took him back into the place they were meeting at and he went over the ones he missed and helped correct him in that and through that, David passed him.
>
> He understood what was going on and I remember his mother looking at us and said David walked out and said, mom, he did good, he did real good, and the reason I'm telling you is because what this young boy who was a Boy Scout wanted to do was because David took that time with him he said on the day of his funeral he was going to be up in Waynesboro, there is a little historical tollhouse there, and the Boy Scouts were going to be standing there. I'm going to let you know I'm going to be the Boy Scout with the American flag saluting to honor your son. That's the type of impression he had onto the youth of this community.

Id. at 1457-58. Afterwards, Mr. Grove remarked that he saw how his son "used to deal with some youngsters that age he would care about" and noted that "the kids loved him, they really did." Id. at 1458. Although trial counsel did not object to this portion of Mr. Grove's testimony, counsel did object when the Commonwealth asked Mr. Grove how the

justice system impacted the family, arguing the question implicated appellant's right to a jury trial. The trial court sustained the objection. The trial court then asked the Commonwealth to rephrase its question, leading to the following exchange:

> **[Commonwealth]:** Mr. Grove, the fact that both you and your wife are now the parents of a law enforcement officer who was murdered in the line of duty, can you just tell us how that fact has impacted you and your wife?
>
> **[Mr. Grove]:** Well, I mean he's still our son and we still grieve and through all of this basically there's not been closure like we would think of normally for a family and it's a constant[ ] grieving. It's dealing with all the details up to this point [that] has been sometimes stressful and trying.

*Id.* at 1463. After Mr. Grove's testimony concluded, the Commonwealth rested its presentation of penalty phase evidence.

Appellant's penalty-phase defense "focused on his loving relationship with friends and family, in particular his nine[-]year[-]old daughter, Jasmine, and the substantial impairment he experienced from alcohol consumption." *Johnson I*, 107 A.3d at 65-66. In support, appellant called several witnesses to testify regarding his character:

> Former next-door neighbor Barbara Garde watched appellant grow from a child to an adult and a father. She described him as a "very, very good loving, loving, responsible father in my opinion." On cross-examination, she was asked whether she knew of his 2005 conviction for an incident in which he was engaged in a high[-]speed chase with the police while his daughter was in the back seat, to which Garde responded "no, I wasn't aware of that. It doesn't change my opinion, though." To the question of whether she would still consider appellant a very good, loving, responsible father, Garde replied "Well, maybe except for that one incident. There's a lot more to being a father than just one single incident.
>
> Appellant's younger sister, Brandy Johnson, described the loving relationship between appellant and Jasmine, saying "[s]he's always been daddy's girl since the day she was born. Christopher would do anything for her." During her testimony, a video was played depicting Jasmine's third birthday party while Brandy Johnson narrated scenes explaining how appellant got the cake, prepared the whole day beforehand, and doted on Jasmine at the party in a variety of ways. N.T. at 1558–59. Brandy also

described how appellant helped raise her son and "taught him how to be a boy" during this same timeframe. "He would do anything for them two little babies[,]" Brandy testified. She also testified as to how appellant took better care of her than their father did when they were children growing up together.

Appellant's mother, Kimberly Topper, gave extensive testimony about appellant's history as a father starting from the day Jasmine was born: "I could see the lights in his eyes was [sic] like the lights. I could see the beauty that he saw in her like the day he was born that I saw in him." Topper described how appellant assumed primary responsibility for Jasmine's emotional and financial support when Jasmine was around one year old because of the mother's drug using lifestyle:

> **[Topper]:** He would say, mom, I can't keep my eyes open anymore. He says, I'm afraid Jasmine is going to get hurt. Can you come here and just let me get an hours's [sic] sleep, two hours, something like that and I'd go get her and bring her back to work with me. . . . Sometimes I'd have to wait until I got off work at three or four so he could get a couple hours sleep before he had to go back to work and sometimes she'd show up just before he had to go to work. She would be out, you know, she was running around with friends and —

Topper also narrated a slide show which included photos depicting, among other things, appellant and Jasmine together in her first years.

*Johnson I*, 107 A.3d at 68-69 (internal citations, emphasis, and some capitalization omitted).

Also testifying on behalf of appellant were Chaplain Ronald Cordell, Pastor Steven Herr, Zachary Farley, Sergeant Paula Garris, Donald Pine, Leslie Filer, Associate Pastor Sadie Pounder, and Officer Jonathan Torres. Chaplain Cordell, who visits the Adams County prison once a week, testified appellant is "an outstanding guy" who "cancelled visitation rights" to attend Bible study every week and "had an excellent relationship with the Lord." N.T. Penalty Phase Hearing, 10/3/12, at 1525, 1527-28. Pastor Herr, from Christ Lutheran Church in Gettysburg, testified he was invited by trial counsel to offer pastoral care to appellant and appellant was engaged in theological and biblical study

prior to their interactions. Farley testified he and appellant were friends and that appellant was funny, likeable, and trustworthy. Sergeant Garris, from the Adams County Prison, testified appellant was very social in prison, nonviolent, and respectful. Pine, appellant's older cousin, testified appellant considered his daughter Jasmine a big priority when he was not drinking, and he never engaged in violent behavior. Filer, appellant's fiancé at the time of Officer Grove's death, testified to appellant's relationship with his daughter, his use of alcohol to self-medicate when he was depressed, and how she knew he was intoxicated on the day of the murder from their phone calls and the text messages he sent her. Associate Pastor Pounder, from Trinity Lutheran Church in Lancaster, testified she met with appellant eight to ten times in the Adams County Prison and found his foundation of knowledge in the Bible to be long term and exceptional, even exceeding that of some seminarians. Officer Torres, from the Adams County Prison, testified appellant helped with cleaning the unit and that he was social, cooperative, and respectful. Appellant also testified and offered his condolences to the Grove family.

As for expert testimony, trial counsel called Dr. John Hume, an expert in the field of forensic psychiatry, and Dr. William Russell, an expert in the field of forensic psychology. Dr. Hume testified he met with appellant approximately six weeks after Officer Grove's death and his mental status exam revealed appellant suffered from depression and bipolar disorder, both of which had been documented as far back as February 2005. Dr. Hume also found appellant was severely depressed and drinking excessively at the time of Officer Grove's death. Based on appellant's mental health issues, which were exacerbated by his alcohol consumption, Dr. Hume concluded "with reasonable medical certainty that [appellant's] mental state was such that under the statute, he was under the influence of extreme mental or emotional disturbance and that the capacity to appreciate the criminality of his conduct or to conform his conduct to the

requirements of the law was substantially impaired." N.T. Penalty Phase Hearing, 10/3/12, at 1636.

Dr. Russell testified appellant had inconsistent parenting as a young child, abandonment issues, and received inappropriate physical punishment, but there were no behavioral problems usually associated with that type of upbringing in his school record. Instead, Dr. Russell believed appellant's depressive mood disorder caused him to act out by not paying attention in class, and in turn, not scoring well on standardized tests. This depressive mood disorder, along with his drinking and other substance abuse problems, according to Dr. Russell, is the only way to explain why appellant suddenly became violent and killed Officer Grove. Dr. Russell also stated he believed "there are two Christopher Johnsons[, one] who is not drinking, who is medicated, who is in a structured environment, for instance his prison[, and] that's a different individual than the unmedicated substance and alcohol abusing Christopher Johnson. They're two very different people[.]" N.T. Penalty Phase Hearing, 10/4/12, at 1699-1700. Lastly, Dr. Russell testified he believed appellant "will have no problem adjusting [to life in prison] and being able to provide assistance to younger inmates as he goes on in his life" and will "be able to have more contact with his family" in state prison. *Id.* at 1701-02. On cross-examination, however, Dr. Russell admitted he conducted no psychological testing on appellant himself, appellant had no head trauma, and he was not mentally disabled.

In rebuttal, the Commonwealth presented the testimony of Officer Daniel Lanious of the Carroll Valley Police Department and Dr. Timothy J. Michaels, an expert in the field of forensic psychiatry. Officer Lanious testified he attempted to pull appellant over while working for Liberty Township in 2005, but appellant increased his speed to over 100 miles per hour. He further testified he followed appellant's vehicle for three to four miles until he eventually stopped and arrested appellant for endangering the welfare of a child, his then fourteen-month-old daughter Jasmine.

Dr. Michaels testified he evaluated appellant after his arrest and a test he administered showed appellant had schizophrenia and a mood or personality disorder. However, Dr. Michaels believed appellant exaggerated his mental health condition while taking the test. He explained that when looking at the results in conjunction with evaluations and past records, there was nothing, other than the test results, to suggest appellant was out of touch with reality or under extreme emotional distress at the time of Officer Grove's death such that he did not have the capacity to conform his behavior to the requirements of the law. According to Dr. Michaels, this finding was based on medical records from August 2010 stating appellant was not depressed; his actions following the murder and his statement to police following his arrest, both of which showed he was aware of the criminal nature of his actions; and Dr. Michaels's own evaluation, which revealed that appellant's thinking was organized and his mood was appropriate given the circumstances of his situation.

Trial counsel then recalled Dr. Russell and he testified regarding the test administered to appellant by Dr. Michaels. While Dr. Russell agreed appellant did not suffer from schizophrenia, his opinion differed from that of Dr. Michaels in that he did not believe appellant exaggerated his mental health condition. Instead, according to Dr. Russell, an individual being on an elevated schizophrenia scale is perfectly normal for inmates facing extensive prison sentences since a significant portion of the schizophrenia scale is based on social alienation and hopelessness and those facing long prison sentences will feel socially alienated and hopeless. Thus, Dr. Russell opined, the test administered by Dr. Michaels simply showed appellant suffered from depression.

Ultimately, the jury found two aggravating circumstances — the victim was a law enforcement officer and the killing occurred while in perpetration of a felony — and one mitigating circumstance — the catchall mitigator. The jury concluded the aggravating circumstances outweighed the mitigating circumstance and sentenced appellant to death.

## D. Direct Appeal and PCRA Proceedings

This Court affirmed appellant's convictions and death sentence on direct appeal in 2014. *See Johnson I*, 107 A.3d at 98. Thereafter, appellant filed a timely petition and an amended petition pursuant to the PCRA. The amended petition contained fourteen claims: 1) trial counsel were ineffective for failing to object to the venire from Lancaster County; 2) the Commonwealth violated *Batson v. Kentucky*, 476 U.S. 79 (1986)[3] and appellate counsel was ineffective for failing to raise the issue on direct appeal; 3) the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963)[4] by suppressing material impeachment evidence regarding a Commonwealth agreement with Laumann, and trial counsel were ineffective for failing to impeach Laumann's testimony; 4) the trial court's voluntary intoxication instruction was incorrect and trial counsel were ineffective for failing to object to the instruction; 5) appellant's constitutional rights were violated by defective instructions on reasonable doubt and trial counsel were ineffective for failing to object to those instructions; 6) trial counsel were ineffective for failing to investigate, develop, and present compelling mitigation evidence; 7) trial counsel were ineffective for failing to develop, present, and argue available evidence to support the mitigating factor that appellant would adjust well to life in prison; 8) the prosecution elicited improper victim impact testimony and trial counsel were ineffective for failing to object to the purported misconduct; 9) the trial court erroneously instructed the jury that persons who had undergone capital sentencing proceedings in Pennsylvania had received commutations and trial counsel were ineffective for failing to challenge the instruction; 10) the jury failed

---

[3] *Batson* held "a State may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial." *Flowers v. Mississippi*, 588 U.S. 284, 286-87 (2019).

[4] "Under *Brady*, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75 (2012).

to unanimously determine beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances and trial counsel were ineffective for failing to raise that claim; 11) appellant's constitutional rights were violated as a result of bias by former-Justice Eakin's participation in deciding his direct appeal; 12) Pennsylvania's capital punishment system is broken and violates Article I, Section 13 of the Pennsylvania Constitution and the 8th Amendment to the United States Constitution; 13) Pennsylvania's capital punishment system is incompatible with society's evolving standards of decency such that it violates Article I, Section 13 of the Pennsylvania Constitution and the 8th Amendment to the United States Constitution; and 14) the cumulative effect of these errors otherwise entitles him to relief. Appellant was represented in the PCRA court by the Federal Community Defender Officer for the Eastern District of Pennsylvania (FCDO).

The trial judge, President Judge George, recused himself from the post-conviction proceedings because one of the prosecutors in appellant's trial, then-District Attorney Shawn Wagner, had become a fellow jurist on the Adams County Court of Common Pleas. The petition was then assigned to Senior Judge Joseph C. Madenspacher of the Lancaster County Court of Common Pleas (PCRA court). The PCRA court held a five-day evidentiary hearing on three of appellant's claims: 1) whether the Commonwealth violated *Batson* and appellate counsel was ineffective for failing to raise the issue on direct appeal; 2) whether the Commonwealth violated *Brady*; and 3) whether trial counsel were ineffective for failing to investigate, develop, and present compelling mitigation evidence.

First to testify at the evidentiary hearing was Attorney Miele, co-counsel for appellant at trial. Miele testified to the following: 1) he raised a *Batson* challenge when the Commonwealth peremptorily struck a Black prospective juror during voir dire and the trial court denied the challenge; 2) a prison adjustment analysis was not undertaken even

though it was recommended by the mitigation specialist, Dr. Deborah Belknap; 3) evidence regarding extensive mental illness in appellant's paternal family was not introduced to the jury because the defense introduced testimony of appellant's mental health issues; 4) evidence of appellant living in poverty at a young age and transgenerational trauma, including his mother being a victim of rape and incest, was not presented to the jury; 5) he did not believe any agreement existed between Laumann and the Commonwealth; and 6) he would have objected if he was aware that any improper jury instructions were given.

Next to testify was Attorney Rice, also co-counsel for appellant at trial. Rice testified: 1) there was an objection to the Commonwealth's peremptory strike of a Black prospective juror during voir dire, but she did not raise the issue on direct appeal because she had not raised a *Batson* claim before and did not believe race was an issue in the case; 2) she received a report concluding there was anecdotal evidence, including the 21 empty beer cans found in his truck, that appellant could not form the specific intent to kill due to his voluntary intoxication and she shared this report with the Commonwealth prior to trial; 3) she received a letter from the Commonwealth prior to trial confirming Laumann would only be charged with violations of the Game and Wildlife Code (game law), 34 Pa.C.S. §§101-2965, for his actions on the night of Officer Grove's death and there would be no other agreements between Laumann and the Commonwealth, nor did she have any reason to believe the Commonwealth ever threatened Laumann with additional charges; 4) no experts were retained to testify about appellant's behavior in prison even though it was recommended by Dr. Belknap because she did not understand the importance of an expert evaluation regarding prison adjustment; 5) no investigation was conducted into the extensive mental illness in appellant's paternal family, appellant living in poverty in the early stages of his life, or the transgenerational trauma suffered by appellant's mother; 6) she relied on Dr. Belknap because she had zero experience with

mitigation evidence at the time of appellant's trial; 7) the mitigation defense focused on appellant's relationship with his daughter rather than his family's mental health issues because she believed evidence of appellant's current relationship with his family would be more persuasive than evidence regarding transgenerational trauma, a phenomenon she did not understand the importance of at the time; and 8) she met with the Commonwealth about the PCRA petition for only a few minutes while she met with the FCDO numerous times and for multiple hours.

The PCRA court then heard testimony from Judge Wagner, who, again, in his former position as District Attorney of Adams County, co-prosecuted the case against appellant and also personally handled the criminal case against Laumann. Judge Wagner testified he did not normally handle game law violations, but he handled the charges against Laumann because the charges arose from the investigation into the death of Officer Grove. Judge Wagner further testified Laumann was originally charged with six game law offenses, but four summary offenses were withdrawn when Laumann pled guilty to the two most serious charges in exchange for a probationary sentence of nine months, which was the maximum supervision under the law. Judge Wagner also stated he made a strategic decision to wait to charge Laumann until after appellant's trial was completed, but there was not probable cause to charge him with any other criminal offenses, including obstruction of justice, even though he lied to police in the early stages of the investigation into Officer Grove's death. While Judge Wagner admitted he had conversations with Laumann and his attorney regarding appellant and Laumann's drinking on the night of Officer Grove's death, Judge Wagner made clear there was never any agreement with Laumann other than the letter explaining the potential game law charges that would be filed against him. Judge Wagner reiterated that no promises were made in exchange for Laumann's testimony in appellant's case and he was not paid by the District Attorney's Office for his testimony.

Dr. Belknap, the defense mitigation specialist, testified next. Dr. Belknap stated she believed the facts that appellant grew up impoverished and had a family history of mental illness and transgenerational trauma, such as the sexual abuse of his mother, were important factors for mitigation. Dr. Belknap also testified that she provided this information to Attorney Rice and recommended they retain an expert on trauma to explain the importance of this information to the jury, as well as recommending a prison adjustment analysis be undertaken. In relation to Dr. Belknap's testimony, Judith A. Leidig, appellant's paternal aunt, testified regarding her and her family's histories of mental illness, explaining she spoke with Dr. Belknap prior to appellant's trial in 2012.

Dr. Mark Cunningham, an expert in the field of clinical and forensic psychology, also testified at the PCRA hearing. Dr. Cunningham explained he was asked to evaluate appellant regarding his potential for a positive prison adjustment as a mitigating factor and he found there was a very high likelihood that appellant would adjust to prison in a positive way. He stated that research available in 2012 demonstrated concerns with the issue of a capital defendant's future violence. He explained the issue can be the "elephant in the room" during jury deliberations because jurors may believe a capital defendant will kill again if not informed by expert testimony that such reoccurrence is unlikely. Dr. Cunningham then testified regarding the testimony he could have provided had he been called at appellant's trial. This testimony consisted of research demonstrating that the commission of violent crimes in the community is not a good predictor of criminality or violence in prison. Dr. Cunningham also discussed his assessment of appellant, including his review of appellant's prison records and his interview of appellant, all of which indicated he was unlikely to engage in violent acts in prison. However, on cross-examination, Dr. Cunningham admitted the research he cited actually describes jurors being concerned with the future violent actions of capital

defendants who may be released, whereas Pennsylvania jurors are instructed that capital defendants sentenced to life in prison will never be released.

Next to testify at the PCRA hearing was Dr. Jethro Toomer, another expert in the field of clinical and forensic psychology. Dr. Toomer testified he prepared a report in April of 2021 after performing forensic and psychological evaluations of appellant and reviewing appellant's school, employment, treatment, and prison records. In general, Dr. Toomer concluded appellant's behavior was influenced by personal issues, such as family instability, poverty, depression, and substance abuse, rather than any planning or premeditation. Dr. Toomer also diagnosed appellant with post-traumatic stress disorder (PTSD) from being exposed to life-threatening situations that posed an ongoing threat, which made appellant prone to impulsivity. Yet, Dr. Toomer could not point to a specific event that would cause appellant to suffer from PTSD.

Next, Laumann testified that he initially lied to police about shooting a deer on the night of Officer Grove's death, even though the detectives gave him multiple opportunities to be honest about the events of the night. Laumann also stated that at some point prior to appellant's trial, he and his attorney, Steven Rice, Esq., spoke with then-District Attorney Wagner and were told he was facing game law charges, but that was the extent of any discussion regarding charges against him prior to appellant's trial. With regard to appellant's alcohol consumption on the night of the murder, Laumann testified he knew it was an issue in the case, but never thought or was told that he would get a break on his own charges if the Commonwealth was satisfied with his testimony at appellant's trial. Moreover, Laumann insisted he never told Filer appellant was very drunk that night or that Laumann felt pressured to say appellant was not that drunk on the night in question.

Attorney Steven Rice testified he was concerned about Laumann's criminal liability, but also knew he was an important witness in the Commonwealth's case because appellant's alcohol consumption would be a significant issue at trial. Attorney Rice also

acknowledged he allowed Laumann to sit for an interview with then-District Attorney Wagner and that he would not have done so unless he thought it would improve Laumann's position with regard to his own criminal charges. Although Attorney Rice could not recall the particulars of any discussion with then-District Attorney Wagner or Laumann, he stated that his custom would have been to try to exploit Laumann's cooperation in any discussions with the District Attorney's Office before or after appellant's trial and notify his client that his testimony for the Commonwealth could be very important to his sentence for any criminal violations he may have committed. However, Attorney Rice noted he searched for e-mail discussions between himself and then-District Attorney Wagner and the only significant correspondence was the letter noting Laumann would be charged with only game law violations, which was sent on September 25, 2012, the day prior to Laumann's testimony in appellant's case.

Finally, Filer testified Laumann told her he felt pressured not to testify about appellant's actual intoxication level after a meeting with then-District Attorney Wager and Attorney Steven Rice. In particular, Filer stated Laumann told her then-District Attorney Wagner used pictures from her baby shower and pictures of her daughter from Facebook to intimidate him in this regard. Filer also testified Laumann told her after appellant's trial that he felt bad he could not testify about appellant's intoxication level and about the outcome of appellant's case. On cross-examination, however, Filer admitted she never told Attorney Kristin Rice, appellant's attorney, about these purported discussions with Laumann. Filer also acknowledged she had not provided that information to attorneys from the FCDO when they first came to her home, but did so on a second occasion; she also stated she declined to discuss her statements with the Adams County District Attorney's Office prior to testifying at the PCRA hearing.

Following the evidentiary hearing, the PCRA court determined appellant was not entitled to relief, denied his amended PCRA petition, and filed an accompanying opinion.

Relevant to this appeal, the court first found appellant failed to demonstrate prejudice regarding trial counsel's failure to object to the venire in Lancaster County because none of the jurors selected indicated they had any prior knowledge of the case or had formed an opinion of guilt or innocence. The court also held the record was insufficient to sustain appellant's *Batson* claim as he pointed to only one strike against a minority venireperson, a second minority venireperson was selected as a juror, and the Commonwealth provided a reasonable explanation for the strike. Additionally, the PCRA court held there was no evidence to support appellant's *Brady* claim since Laumann, then-District Attorney Wagner, and Laumann's counsel all testified there was no agreement with the Commonwealth in exchange for Laumann's testimony, nor was there any reason for such an agreement because appellant's own statements made clear his level of intoxication was not at the level that could reduce his conviction for first-degree murder. With regard to the alleged mistake in the voluntary intoxication instruction, the PCRA court questioned whether it was a mere a transcription error but, in any event, held appellant failed to demonstrate prejudice as his actions on the night of Officer Grove's death provided overwhelming evidence that he was capable of forming the specific intent to kill. According to the court, "[s]ome of the acts that showed that is as follows: (1) [t]he ability to kill a deer; (2) [s]afely pulled over his truck when pulled over by Officer Grove; (3) [t]old Ryan Laumann he was not going back to jail; (4) was able to reload his pistol during the gunfight; (5) killed Officer Grove by shooting him in the head; (6) he got away safely; and (7) he successfully disposed of his gun." PCRA Court Opinion, 7/3/23, at 4.

Regarding trial counsel's alleged ineffectiveness in presenting mitigation in the penalty phase, the PCRA court held trial counsel undertook a reasonable investigation and developed a partly successful case in mitigation. The court observed "a wide spectrum of the community was able to provide information about [appellant]" and opined that "[t]hese types of witnesses who testify for a defendant are often more helpful than a

paid expert." *Id.* at 5. The court noted this mitigation evidence had some effect as the jury rejected two aggravating circumstances and found the catchall mitigator in favor of appellant, but the fact that appellant murdered a law enforcement officer by shooting him in the head made it difficult for appellant to avoid the death penalty. The court also rejected appellant's claim regarding the failure to provide prison adjustment evidence from an expert, finding it was simply not necessary since correctional officers had testified regarding appellant's good behavior in prison. In the court's view, "[t]he testimony of two correction officers who actually knew [appellant] and knew there was no assaultive behavior, clearly outweighs any testimony from someone who did not know [appellant] and could not testify if there [w]as any assaultive behavior." *Id.* at 6. The PCRA court then found appellant's improper victim impact testimony claim was meritless because it was clear from the record that Mr. Grove testified regarding the impact Officer Grove's death had on his family rather than the community at large. Lastly, the court held appellant's failed individual claims do not, when viewed in the aggregate, result in a reasonable probability of a different result at the trial or the penalty phase and thus, appellant was not entitled to relief on his cumulative prejudice claim.

Appellant appealed directly to this Court pursuant to 42 Pa.C.S. §9546(d). He raises nine issues:

1. Were trial counsel ineffective for failing to object to the trial court's erroneous instructions on voluntary intoxication?

2. Did the Commonwealth violate *Brady* [] by failing to disclose material and exculpatory impeachment evidence relating to witness Ryan Laumann?

3.      Did the Commonwealth violate *Napue v. Illinois*, 360 U.S. 264 (1959)[5] by presenting and allowing to go uncorrected Ryan Laumann's false testimony?

4.      Did the Commonwealth peremptorily strike an African American in violation of *Batson* []? Was appellate counsel ineffective for failing to raise a *Batson* challenge on direct appeal?

5.      Were trial counsel ineffective for failing to object to the venire because the jury pool from Lancaster County was still saturated with the highly prejudicial publicity that had necessitated the original change of venire from Adams County?

6.      Were trial counsel ineffective for failing to present expert evidence that [appellant] could be expected to adjust well to life in prison?

7.      Were trial counsel ineffective for failing to investigate, develop, and present certain mitigation evidence?

8.      Were trial counsel ineffective for failing to object to the Commonwealth's elicitation of improper victim evidence?

9.      Is [appellant] entitled to a new guilt-innocence and penalty phase because of the cumulative effect of the errors in this case?

Appellant's Brief at 1-2.

## II. Review Standards

"Our standard of review is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error." *Commonwealth v. Busanet*, 54 A.3d 35, 45 (Pa. 2012). "Our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the party who prevailed in the PCRA court proceeding." *Id.*

To be entitled to PCRA relief, a petitioner must plead and prove, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S. §9543(a)(2). These errors include a constitutional

---

[5] *Napue* "held that a conviction knowingly 'obtained through use of false evidence' violates the Fourteenth Amendment's Due Process Clause." *Glossip v. Oklahoma*, 604 U.S. __, 145 S.Ct. 612, 626 (2025), *quoting Napue*, 360 U.S. at 269.

violation or ineffectiveness of counsel, which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Id.* at §9543(a)(2)(i)-(ii). A petitioner must also show his claims have not been previously litigated or waived, and that "the failure to litigate the issue prior to or during trial . . . or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." 42 Pa.C.S. §9543(a)(3), (a)(4). An issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. §9544(a)(2). An issue is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." *Id.* at §9544(b).

The majority of appellant's claims concern the effectiveness of trial counsel. When analyzing ineffectiveness claims, we begin with the presumption counsel was effective. *See Commonwealth v. Robinson*, 82 A.3d 998, 1005 (Pa. 2013). To overcome this presumption and be entitled to relief on an ineffectiveness claim, a petitioner must satisfy the performance and prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), by a preponderance of the evidence. This Court has applied *Strickland* by requiring a petitioner to establish three elements: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) appellant suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different had counsel not erred. *See Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987). Furthermore, we are not required to analyze the elements of an ineffectiveness claim in any particular order; if a claim fails under any element of the *Strickland* test, we may proceed to that element first. *Robinson*, 82 A.3d at 1005, *citing Strickland, supra*; *Commonwealth v. Albrecht*, 720 A.2d 693, 701 (Pa. 1998). Thus, "when it is clear that the party asserting a claim of ineffectiveness has failed to meet the

prejudice prong, the claim may be dismissed on that basis alone without a determination of whether the first two prongs of the ineffectiveness standard have been met." *Commonwealth v. Zook*, 887 A.2d 1218, 1227 (Pa. 2005). Alternatively, "we may begin by assessing the merits of a defaulted underlying claim because, if we deem the underlying claim meritless, neither trial nor appellate counsel could be found ineffective." *Commonwealth v. Johnson*, 289 A.3d 959, 980 (Pa. 2023).

### III. Analysis

### A. Voluntary Intoxication Instruction

Appellant claims his trial counsel were ineffective for not objecting to the trial court's instruction to the jury on voluntary intoxication. He maintains the instruction was erroneous in two respects. First, he contends the court erred in instructing the jurors he was permitted to claim "that he was unable to understand the nature and quality of his acts or to distinguish between right and wrong with respect to those acts. In other words, either unable to know what he was doing or to judge that it was wrong." Appellant's Brief at 11, *quoting* N.T. Trial, 10/2/12, at 1348-49 (emphasis omitted). He argues this language "inserted the different and more burdensome standard from the defense of **involuntary** intoxication." *Id.* (emphasis supplied by appellant), *citing* Involuntary Intoxication, S.S.J.I. (Crim.), §8.308C ("The defense of involuntary intoxication is available to a person if at the time of committing an act, the person's faculties were so impaired as the result of involuntary intoxication that the person was unable to understand the nature and quality of his or her act or to distinguish between right and wrong with respect to the act – in other words, either unable to know what he or she was doing or to judge that it was wrong."). Second, appellant faults the court for charging the jury that it could not "find the [d]efendant guilty of first[-]degree murder unless you are satisfied beyond a reasonable doubt that the [d]efendant, despite any intoxicated condition was at the time **incapable** of forming the specific intent to kill and did in fact form that intent." *Id.*

at 13, *quoting* N.T. Trial, 10/2/12, at 1349 (emphasis supplied by appellant). He asserts the court's use of the word "incapable" rather than "capable" was "the opposite of the law." *Id.* He notes the Third Circuit found error with a similar instruction in *Whitney v. Horn*, 280 F.3d 240, 254-57 (3d Cir. 2002) (declaring as "erroneous" a voluntary intoxication instruction which provided, "you cannot find the defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the defendant was so intoxicated at the time that he was incapable of judging his acts and their consequences or incapable of forming a willful, deliberate and premeditated design to kill"). Here, appellant emphasizes, "unlike in *Whitney*, this error occurred after the trial court had already erred by imposing the inapplicable, burdensome standard from involuntary intoxication and insanity." Appellant's Brief at 13.

Appellant further argues, again citing *Whitney*, that trial counsel had no reasonable basis for failing to object to the erroneous voluntary intoxication instruction. Moreover, he maintains he was prejudiced by trial counsel's failure to object as his only defense at trial was that his intoxication rendered him incapable to form the specific intent necessary to be convicted of first-degree murder. He claims the court obliterated his defense when it inserted the standard from the defense of involuntary intoxication, a standard far more difficult to meet, together with instructing the jury they must find him incapable, rather than capable, of forming the specific intent to kill. Finally, appellant takes issue with the PCRA court's opinion, arguing the court ignored the involuntary intoxication language that was inserted into the instruction and made erroneous legal conclusions regarding actions taken by appellant before and after Officer Grove's death. According to appellant, these actions only showed he could act with intention rather than act with the specific intent to kill. While appellant acknowledges there was sufficient evidence suggesting he acted with the specific intent to kill, he argues there was also sufficient evidence for the jury to

infer he did not, and he submits this claim requires reversal because the jury was never able to consider the evidence under the proper legal standard.

In response, the Commonwealth argues appellant failed to rebut the presumption of effectiveness for this claim. It faults appellant for not disproving the word "incapable" was a transcription error, as the PCRA court suggested, which he could have done by simply asking trial counsel at the PCRA hearing whether the transcript accurately reflected the instruction given at the conclusion of trial. In any event, according to the Commonwealth, there is no reasonable probability that the jury interpreted the instructions to mean the Commonwealth had to disprove specific intent given that the trial court repeatedly and correctly instructed the jury the Commonwealth had to prove appellant acted with the specific intent to kill. With regard to the trial court importing part of the instruction for involuntary intoxication, the Commonwealth argues the instruction given was not so different from the standard instruction such that it would have made any difference to the jury.

Lastly, the Commonwealth contends appellant failed to prove prejudice as appellant's actions before and after the murder made clear he was not overwhelmed by intoxication to the point of losing his faculties. According to the Commonwealth, these actions included: 1) safely driving his vehicle prior to encountering Officer Grove; 2) shooting a deer from 40 yards away with a spotlight in one hand and a rifle in the other; 3) safely pulling over to the side of the road when stopped by Officer Grove; 4) walking backwards toward Officer Grove without falling; 5) grabbing Officer Grove's firearm while pulling his own gun with his other hand; 6) running to an elevated position without falling to fire at Officer Grove from a superior position; 7) emptying his magazine, reloading it, and emptying it again; 8) shooting Officer Grove in the back of the head; 9) fleeing safely in his truck while treating a gunshot wound with a makeshift tourniquet; and 10) disposing of his gun in the woods and finding his way back to his cabin. Based on these actions,

the Commonwealth claims appellant's voluntary intoxication defense "strains credulity" and, thus, appellant failed to demonstrate he was prejudiced by trial counsel's failure to object to the voluntary intoxication instruction. Commonwealth's Brief at 15.

In reply, appellant claims there is no legal requirement for a PCRA petitioner to prove there was no transcription error. He argues caselaw from this Court, including our recent decision in *Commonwealth v. Montalvo*, 244 A.3d 359, 370 (Pa. 2021), makes clear the transcript is the court record unless a party shows otherwise. Appellant further argues the Commonwealth is incorrect in asserting the instruction given was not so different from the standard instruction for voluntary intoxication, noting courts have long recognized this conflation as error. *See* Appellant's Reply Brief at 4, *citing, e.g., People v. Baker*, 268 P.2d 705, 720-21 (Cal. 1954). Regarding whether he made a credible case for voluntary intoxication, appellant charges the Commonwealth with raising this argument too late. Appellant insists the Commonwealth should have objected to his request for a voluntary intoxication instruction in the first place, and its failure to do so was a recognition that appellant met the standard for requesting such an instruction.

Furthermore, while acknowledging that "some facts support an inference that [he] acted with the specific intent to kill," appellant nonetheless maintains there is "extensive other evidence, unmentioned by the Commonwealth[,]" which "supports the inference that [he] lacked the specific intent to kill due to voluntary intoxication." *Id.* at 7. Specifically, appellant notes: 1) Dr. Guzzardi testified appellant's blood alcohol content was likely between .15 and .22 at the time of the shooting; 2) Leslie Filer testified appellant was slurring his words by noon on the day of the crime; 3) Dr. Bullock testified appellant's vision would have been blurred by headlights and emergency lights and this effect would have been compounded by intoxication; 4) Dr. Lalani testified appellant told him he drank twelve beers; and 5) Trooper Navitsky testified appellant never said he was trying to kill Officer Grove or even meant to shoot him. As such, appellant concludes he made a case

for a voluntary intoxication defense and the trial court's instruction error, along with trial counsel's failure to object, prevented the jury from properly considering his defense.

Because it is clear appellant has not satisfied the requisite prejudice prong of the ineffectiveness standard, we proceed directly to this independently dispositive issue. *See Zook*, 887 A.2d at 1227. In the *Whitney* case cited by appellant, the Third Circuit found that although the trial court's instruction on voluntary intoxication was erroneous, and trial counsel were ineffective for failing to object to it, Whitney was nonetheless entitled to no relief on his ineffectiveness claim because he was not prejudiced. In an incisive discussion we quote at length below, the *Whitney* court explained that given the powerful evidence of Whitney's specific intent to kill and lucid mental state at the time of the crime, it was not reasonably probable an objection to the faulty instruction would have altered the verdict of first-degree murder:

> The evidence of Whitney's state of mind was such that the integrity of his conviction for first degree murder is not undermined in the least by the erroneous jury charge.
>
> It is uncontroverted that the victim suffered twenty-four stab wounds, including a deep wound to the head, and another wound to the ventricle of his heart. In Pennsylvania, specific intent to kill may be demonstrated by nothing more than use of a deadly weapon upon a vital part of the body. Thus, in *Commonwealth v. Meredith,* [ ]416 A.2d 481, 485 ([Pa.] 1980), based upon the number and severity of the blows inflicted, areas of the body where the blows were administered, and relative size and age of the victim, the court stated: "[i]f a deadly force is knowingly applied by the actor to the person of another, the intent to take life is as evident as if the actor stated the intent to kill at the time the force was applied."
>
> Here, of course, Whitney did just that. He proclaimed his intent to kill during the course of his intrusion into the deceased's apartment. The jurors did not have to rely upon the circumstantial evidence of the number and severity of the wounds to determine if Whitney intended to kill. They could merely take him at his word. Whitney's announcement of his intent perfectly coincides with, and explains, the location and number of the victim's wounds. There was, therefore, no real issue about whether his blows just happened to land on a vital part of the victim's body.

Of course, the prosecution's burden in a criminal case is a high one. A capable defense attorney might attempt to raise a reasonable doubt by arguing to the jury that Whitney was so intoxicated that he did not know what he was saying, that he was simply ranting in a drunken stupor, and that his blows just happened to land on vital organs as he coincidentally stated an "intent" to kill. However, that was not the evidence. Whitney did not flail his arms about in a wild, unfocused, and uncontrolled manner. Nor was he ranting when he expressed his intent to kill his victim. Rather, the evidence easily establishes beyond a reasonable doubt that he knew exactly what he was saying, and exactly what he was doing. Murtaza testified that Whitney's demeanor was calm and collected. This is corroborated by his behavior while he was in her apartment. In the middle of that burglary, while struggling with Murtaza, he walked to her refrigerator to get a drink of water after ripping her clothes off and announcing that he was going to rape her and kill her husband.

We realize, of course, that there was evidence that Whitney was woozy, and that his speech was slurred, and he had alcohol on his breath. However, that is merely what entitled him to a voluntary intoxication charge. It must be considered in context with the entire record, most of which is undisputed. For example, it is undisputed that Whitney was only able to perpetrate these attacks after he climbed onto a second-story ledge and then climbed through not one, but two windows. He was sufficiently cognizant to realize that his first victim might identify him, and he therefore inquired about her ability to recognize him. He then again negotiated the second-story ledge once again and maneuvered to the apartment where the fatal stabbing occurred. There, he was again able to climb from the ledge through a window. That is not consistent with the actions of one who is in a drunken stupor.

However, the most telling evidence of Whitney's lucid mental state is the fastidious manner in which he attempted to prevent Ms. Minor from speaking on the telephone. We refer not merely to his instructions to her when she tried to place a telephone call, but his actions in disabling her telephone as well. In disabling that phone, Whitney demonstrated motor coordination and dexterity, as well as presence of mind and cognition that was totally inconsistent with the level of impairment that might create a reasonable doubt about one's ability to form the specific intent to kill. He did not merely cut the telephone wires, he disassembled the telephone, unscrewed the speaker portion of the handset, and removed the microphone inside. He thereby rendered the phone inoperable.

In addition, when Murtaza emptied her purse Whitney had sufficient mental facility to appreciate the amount of money she had and express disappointment that she did not have more. And he similarly demonstrated his intent to rape Murtaza, and clearly demonstrated an intent to do so by opening his pants and taking out his penis, just as he demonstrated his

intent to kill by announcing his intent and then stabbing his victim twenty-four times.

* * *

Surely, there is no substantial likelihood this erroneous instruction prejudiced Whitney's chances with the jury. Faced with this evidence we do not understand how any reasonable jury could have had *any* doubt about whether Whitney was too inebriated to form the intent to kill. The evidence of Whitney's mental state was nothing short of overwhelming. Accordingly, we can not agree with the district court's conclusion that the erroneous instruction in any way undermined this verdict. Whitney's claim of prejudice fails under both *Brecht*[ *v. Abrahamson*, 507 U.S. 619 (1993)] and *Strickland*. There is no reasonable probability that, but for counsel's failure to object to the faulty instruction, the result of the proceeding would have been different. Similarly, the erroneous instruction could not have had a substantial and injurious effect or influence in determining the jury's verdict.

*Whitney*, 280 F.3d at 259-61 (additional internal citations, quotations, brackets, and ellipses omitted).

This cogent analysis by the Third Circuit, while not binding, is nonetheless instructive and persuasive here. Parallel to the facts in *Whitney*, appellant's specific intent to kill is established by his use of a deadly weapon on a vital part of the victim's body; he shot Officer Grove with a firearm three times, including a fatal "gunshot wound to the neck." N.T. Trial, 9/27/12, at 751; *see Commonwealth v. Thomas*, 215 A.3d 36, 40 (Pa. 2019) ("The specific intent to kill may be inferred from the defendant's use of a weapon on a vital part of the victim's body.") (internal citation omitted). As stated in *Whitney*, this Court has declared, "[i]f a deadly force is knowingly applied by the actor to the person of another, the intent to take life is as evident as if the actor stated the intent to kill at the time the force was applied." *Meredith*, 416 A.2d at 485. Moreover, while appellant, unlike Whitney, may not have explicitly stated his intent to kill, he did tell Laumann he was "not going back to jail" just after being pulled over by Officer Grove, *see* N.T. Trial, 9/26/12, at 518, and he also whispered to Laumann that he had a ".45 on his side" during the encounter with Officer Grove, *see id.* at 521. These statements reinforce the presumption

that appellant acted with the specific intent to kill. *See Commonwealth v. Ford*, 650 A.2d 433, 437 (Pa. 1994) (specific intent may be established through defendant's words or acts, or circumstantial evidence, considered with all reasonable inferences from that evidence). Thus, like in *Whitney*, there is no real issue regarding whether the shots fired by appellant just happened to land on a vital part of Officer Grove's body.

To be sure, appellant presented evidence at trial of his intoxication and argued he was too intoxicated to know what he was doing or saying and, therefore, unable to form the specific intent to kill. The defense evidence regarding appellant's intoxication included the facts that: his blood alcohol content was between .15 and .22 at the time of the shooting, *see* N.T. Trial, 9/28/12, at 1008-09; he was slurring his words by noon on the day of Officer Grove's death, *see* N.T. Trial, 9/27/12, at 920; his vision would have been blurred by headlights and emergency lights and this effect would been compounded by his intoxication, *see* N.T. Trial, 10/1/12, at 1129-37; and he told the treating emergency physician he had twelve beers on that day, *see* N.T. Trial, 9/27/12, at 896.

While this evidence entitled appellant to the voluntary intoxication instruction, we must view it in context of the entire record, some of which was uncontested. It is true appellant contested Laumann's testimony regarding appellant's state of mind in terms of his level of intoxication, but other parts of his testimony were not contested at trial, nor have they been contested in this appeal. For instance, Laumann also testified appellant was able to: climb up and down a roughly 15-foot ladder into a tree stand while carrying a crossbow without any difficulties, *see* N.T. Trial, 9/26/12, at 488-91; drive his truck with one hand while the other was holding a spotlight out the window, *see id.* at 498; navigate a stretch of road where the two had gotten stuck only ten days prior, *see id.* at 502-03; shoot a deer from 40 yards away with one hand while holding the spotlight in his other hand, *see id.* at 505-15; pull over and comply with Officer Grove's commands, *see id.* at 517-23; extend his arm while leaning backwards and fire at least three shots at Officer

Grove, *see id.* at 527-33; and get back in his truck, load a new clip into his firearm, and navigate "[r]eal narrow,[] bumpy, and real windy" roads while driving 60-80 miles per hour, *id.* at 539.

The testimony of Trooper Navitsky, who took a statement from appellant the morning after the murder, also demonstrated appellant's mental state was lucid shortly after he shot Officer Grove. Trooper Navitsky testified appellant told him he used his belt as a tourniquet to compress his wound. *See* N.T. Trial, 9/25/12, at 324. In addition, appellant told Trooper Navitsky that although he was right-handed, he was able to manipulate the release on his holster with his left hand and transfer his firearm to his right hand to exchange gunfire with Officer Grove. *See id.* at 323, 346-47. Appellant also told Trooper Navitsky he traveled through a wooded area on foot until he arrived at a high peak, where he threw his firearm down one side and the holster down the other side. *See id.* at 323-24.

Like the *Whitney* court, we find the actions taken by appellant before, during, and after the shooting of Officer Grove, provide overwhelming evidence that his mental state was such that he could properly form the specific intent to kill. He engaged in a series of dexterous, purposeful, strategic, and self-aware behaviors, including skillfully manipulating multiple weapons, driving over difficult terrain at high speeds, complying with police commands, fleeing the scene, tending to his gunshot wound, and hiding evidence. This was not the conduct of someone so overpowered by alcohol intoxication that he had lost control of his faculties. Rather, his actions were those of someone who, although imbibing, was lucid, coherent, and oriented to reality, and perfectly capable of forming the specific intent to kill. Appellant's own undisputed conduct in and around the time of the murder doomed his voluntary intoxication defense to failure. *See Commonwealth v. Spotz*, 47 A.3d 63, 95 (Pa. 2012) ("[a]ppellant's directed, intentional, goal-oriented activity at or near the time of the murder argues strongly against his current

assertion that diminished capacity would have been a viable guilt-phase defense");
*Commonwealth v. Saranchak*, 866 A.2d 292, 301 (Pa. 2005) (no prejudice for failing to present diminished capacity defense where crime involved complex series of actions and appellant gave detailed statements after the crime).  Therefore, appellant is unable to demonstrate he was prejudiced by trial counsel's failure to object to the voluntary intoxication instruction, and his ineffectiveness claim fails.

### B. & C.  *Brady* and *Napue*

Appellant claims he is entitled to a new trial because the Commonwealth violated *Brady* by failing to disclose its ongoing negotiations with Laumann, which reflected an understanding that Laumann would be treated with leniency in exchange for his testimony.  First, appellant claims testimony and documents introduced at the PCRA hearing establish the Commonwealth had an agreement with Laumann.  Most notably, appellant points to the following: 1) the letter then-District Attorney Wagner sent to Laumann's attorney making clear he would only be charged with game law violations and Laumann's last statement to police, both of which occurred shortly after trial counsel informed the Commonwealth they would be pursuing a voluntary intoxication defense; 2) then-District Attorney Wagner's testimony that he strategically waited until after trial to charge Laumann, that he personally handled Laumann's case even though he did not usually handle game law violations, and that he negotiated Laumann's guilty plea — all of which suggests the Commonwealth's lenient treatment of Laumann was contingent on the quality and nature of his testimony in appellant's case regardless of whether there was an explicit agreement or promise made; 3) Attorney Steven Rice's belief that Laumann's testimony in appellant's case would improve his position with the Commonwealth, and his acknowledgment that he received a letter from the District Attorney's Office outlining the charges Laumann would face the day before Laumann's

testimony at appellant's trial; and 4) Filer's testimony that Laumann was afraid and being intimidated not to state appellant's true intoxication level.

Appellant also claims Laumann's testimony at the PCRA hearing does not refute the evidence of an agreement since he testified falsely regarding whether he: knew what charges he would be facing prior to his testimony at appellant's trial, knew he was facing jail time before the day of his guilty plea, and remembered any specifics about his conversations with Attorney Steven Rice and the Commonwealth. This agreement, according to appellant, was suppressed by the Commonwealth when it allowed Laumann to testify at trial that there was no agreement in exchange for his testimony. Appellant further claims this evidence was material because it would have significantly lessened the credibility of Laumann, the only eyewitness to the murder. In this same vein, appellant contends the Commonwealth violated *Napue* by failing to correct Laumann's false testimony and asserts the Commonwealth is unable to demonstrate its failure was harmless beyond a reasonable doubt.

As to the PCRA court's factual findings, appellant claims they are unsupported by the record. Specifically, he faults the court with considering only whether there was an explicit agreement rather than whether the testimony at the PCRA hearing indicated the existence of an implied contingent agreement. Regarding the PCRA court's finding it was unnecessary for the Commonwealth to make an agreement with Laumann concerning appellant's intoxication level, appellant contends this is refuted by the record. He argues his intoxication was the key issue in the case and is likewise refuted by the Commonwealth's efforts to procure a new statement from Laumann almost immediately after learning appellant would pursue a voluntary intoxication defense.

Responding to appellant's arguments, the Commonwealth contends these claims lack merit because the Commonwealth could not have failed to disclose impeachment evidence or failed to correct misleading testimony about its agreement with Laumann

when no agreement existed. The Commonwealth notes that not only did Laumann testify at trial that there was no agreement, but the PCRA court heard similar testimony from then-District Attorney Wagner, Attorney Steven Rice, and Laumann himself. The Commonwealth further claims evidence of an agreement would have been immaterial in any event because compelling evidence, including appellant's sworn statement to police and his actions before and after Officer Grove's death, proved appellant guilty of first-degree murder and disproved his voluntary intoxication defense. Additionally, the Commonwealth submits there was no prejudice here even if an agreement existed since Laumann was cross-examined extensively at trial and trial counsel used Filer's testimony to impeach Laumann's credibility at the PCRA hearing.

Appellant replies by arguing Laumann, then-District Attorney Wagner, and Attorney Steven Rice denied only the existence of an explicit agreement when, in fact, he is arguing there was an implicit contingent agreement that Laumann would be treated with leniency if he testified favorably for the Commonwealth at appellant's trial. In appellant's view, this implicit agreement must be disclosed. *See* Appellant's Reply Brief at 10, *citing Commonwealth v. Bagnall*, 235 A.3d 1075, 1077-87 (Pa. 2020), and *United States v. Bagley*, 473 U.S. 667, 683 (1985).

As to materiality, appellant counters that the sufficiency of the remaining evidence does not render the evidence of an implicit agreement immaterial; instead, he argues we must determine whether the suppression of such evidence undermines confidence in the outcome of trial. *See id.* at 11, *citing Kyles v. Whitley*, 514 U.S. 419, 435 n.8 (1995). Appellant contends evidence of the implicit agreement between Laumann and the Commonwealth undermines confidence in his conviction and sentence because Laumann was the only witness who could testify regarding appellant's drinking and his testimony was damaging to appellant's voluntary intoxication defense. Appellant continues that impeachment evidence does not become immaterial because a witness is

impeached in another manner, especially when there is a significant difference between the suppressed evidence and the testimony heard at trial.

To establish a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Commonwealth v. Natividad*, 200 A.3d 11, 26 (Pa. 2019) (internal citation and quotations omitted). Evidence is material and must be disclosed if there is a reasonable probability that the result of the proceedings would have been different had it been disclosed. *See id.* However, the mere possibility that undisclosed evidence may have helped the defense or might have affected the outcome of the trial does not establish materiality. *See id.* "In evaluating whether a reasonable probability of a different outcome has been demonstrated, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (internal citation and quotations omitted). As such, a defendant need not demonstrate there would not have been enough left to convict after discounting the inculpatory evidence in light of the undisclosed evidence, but "need only show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (internal citation and quotations omitted).

"To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it 'to go uncorrected when it appear[ed].'" *Glossip*, 145 S.Ct. at 626, *quoting Napue*, 360 U.S. at 269. If the defendant makes this showing, a new trial is warranted if there is "any reasonable likelihood" the false testimony could "have affected the judgment of the jury." *Napue*, 360 U.S. at 271.

Appellant's *Brady* and *Napue* claims both hinge on whether the Commonwealth suppressed evidence of an agreement between itself and Laumann, linking his testimony

at appellant's trial with the outcome of his own criminal case. However, the PCRA court found as fact that there was never any such agreement. *See* PCRA Court Opinion, 7/3/23, at 3 ("In this case, there is simply no evidence that an agreement had been made between Laumann and the Commonwealth that no murder charges would be filed if Laumann testified on behalf of the Commonwealth."). This factual finding is supported by the record. At trial, Laumann testified he did not have an agreement with the Commonwealth, no promises were made in return for his testimony, and he expected to be charged with two misdemeanors related to gaming violations. *See* N.T. Trial, 9/26/12, at 551-53, 568-69. Furthermore, at the PCRA hearing, the trial prosecutor and Laumann's counsel testified there was no agreement between the Commonwealth and Laumann concerning his testimony. *See* N.T. PCRA Hearing, 5/24/22, at 90-100; N.T. PCRA Hearing, 7/19/22, at 370-421. In addition, Attorney Miele testified he did not believe an agreement existed between the Commonwealth and Laumann, *see* N.T. PCRA Hearing, 5/23/22, at 21-22, and Attorney Kristin Rice testified she did not believe the Commonwealth ever threatened Laumann with additional charges, *see id.* at 37-39. Laumann himself also testified at the PCRA hearing, again confirming there was no agreement or connection between his testimony at appellant's trial and the resolution of his criminal charges. *See* N.T. PCRA Hearing, 7/19/22, at 347-66. Finally, Laumann testified he was never in contact with Filer on the night of Officer Grove's death and never felt pressured to say appellant was not very drunk on the night in question. *See id.* at 368. Because the PCRA court found there was no agreement between the Commonwealth and Laumann regarding his testimony at appellant's trial — explicit or otherwise — and this finding is supported by the record, it is binding on appeal. *See Busanet*, 54 A.3d at 45.

Bound as we are by the PCRA court's substantiated factfinding, it may be readily concluded no relief is due. Obviously, the Commonwealth could not have withheld an

agreement that never existed in the first place. Nor did the Commonwealth convey or fail to correct false testimony when Laumann testified truthfully that there was no agreement between him and the Commonwealth. For these reasons, appellant's *Brady* and *Napue* claims fail. *See Commonwealth v. Koehler*, 36 A.3d 121, 135 (Pa. 2012) (*Brady* not violated when there is no agreement between Commonwealth and witness regarding lowering charges as consideration for trial testimony).

### D. *Batson* and Appellate Counsel Ineffectiveness

Appellant contends the Commonwealth violated *Batson* by exercising a peremptory strike against Juror 177, a Black man, in a discriminatory manner. He maintains the Commonwealth's strike was motivated by discriminatory intent, and its proffered reason for striking the juror — his misrepresentation of his criminal record — was pretextual since he did not actually have a criminal history, but only adjudications for summary offenses. Appellant further notes the Commonwealth did not question Juror 177 about his criminal history and failed to strike White venire members who served on the jury and had more serious criminal records. Furthermore, according to appellant, the juror questionnaire asked if the jurors had been arrested or investigated by law enforcement, so Juror 177 may have been truthful when he answered "no." As such, appellant contends the Commonwealth's purported reasons for striking Juror 177 do not withstand scrutiny.

Appellant additionally claims his appellate counsel was ineffective for failing to raise a *Batson* claim on direct appeal. He insists the above arguments demonstrate his underlying *Batson* claim had arguable merit, there was no strategic basis for failing to raise the issue on appeal, and he was prejudiced by appellate counsel's failure since *Batson* violations cannot be considered harmless. Lastly, appellant claims *Commonwealth v. Uderra*, 862 A.2d 74 (Pa. 2004) (*Batson* burden-shifting does not apply

when record not appropriately focused and channeled at trial), is inapplicable since an objection was made at trial and the race of Juror 177 is known to all parties

In the Commonwealth's view, *Uderra* does apply even though trial counsel made a timely objection when the Commonwealth sought to strike Juror 177 because trial counsel failed to state the nature of their objection, note basic facts such as the race of Juror 177, or ask the trial court to make the necessary findings. The vague and limited record regarding Juror 177, according to the Commonwealth, was insufficient to raise and preserve a *Batson* claim at the trial level. While the Commonwealth acknowledges appellant has provided further information in his brief, it contends this information is neither contained in the record nor did appellant present supporting witnesses or documentation for such information at the PCRA hearing. As such, the Commonwealth contends appellant failed to carry his burden of proving ineffectiveness.

The Commonwealth also claims appellant failed to prove actual purposeful discrimination, which is required for an unpreserved *Batson* claim, because he relied on a silent record rather than questioning then-District Attorney Wagner regarding the peremptory strike at the PCRA hearing. In fact, as the Commonwealth sees it, there is no evidence of discrimination at all. It notes that other minority venirepersons were selected for the jury, there were no remarks suggesting a discriminatory motive during voir dire, the case was not racially sensitive, and the Commonwealth provided a clear and specific explanation for using the peremptory challenge. With regard to other jurors with criminal histories who were selected, the Commonwealth claims they are not similarly situated to Juror 177 because their criminal histories were not as recent or did not involve crimes, such as public drunkenness, similar to the facts at issue in this case.

In reply, appellant claims he established appellate counsel had no reasonable strategic basis for failing to raise the claim on appeal and the trial record otherwise establishes a *Batson* violation. Appellant further argues he preserved his *Batson* claim

during voir dire since the record shows both the Commonwealth and the trial court interpreted trial counsel's objection as being a *Batson* challenge. While appellant acknowledges he relies on information outside the record, he claims the presumed race of the venireperson at issue was evident to the trial court and he relied on publicly available official court records of their court dockets for his arguments. Appellant continues to claim *Uderra* does not apply, but also argues in the alternative that the record establishes purposeful discrimination because the Commonwealth's purported race-neutral reasons for striking Juror 177 fail to withstand scrutiny, given that it allowed other White jurors to sit on the jury despite their criminal records. Specifically, appellant points to the fact that the Commonwealth now argues it struck Juror 177 for a public drunkenness conviction when it accepted two other jurors, Jurors 52 and 82, despite their arrests for driving under the influence and disorderly conduct, respectively.

As an initial matter, appellant's stand-alone claim of a *Batson* violation is waived under the PCRA. While trial counsel did object to the Commonwealth using a peremptory challenge on Juror 177, there is nothing in the record to demonstrate the objection was based on *Batson*. Rather, when the Court asked counsel "[w]hat are you objecting to so I know what you are objecting to[,]" counsel responded: "I believe that the Commonwealth does not have a reason. I don't believe they have enough information or [know] for sure this is the gentleman that has this record." N.T. Voir Dire, 8/29/12, at 684. Counsel never cited *Batson* or otherwise indicated their objection was premised on alleged racial discrimination in jury selection. By failing to preserve the issue during voir dire, appellant waived his substantive *Batson* claim. *See Commonwealth v. Hanible*, 30 A.3d 426, 475 n.32 (Pa. 2011) ("To the extent this claim can be construed as raising a substantive *Batson* claim, it is waived because Appellant failed to preserve the issue during voir dire."); *Commonwealth v. Daniels*, 963 A.2d 409, 434 (Pa. 2009) (finding *Batson* claim unpreserved when counsel failed to "specifically raise a *Batson* challenge, the trial court

did not interpret the objection as raising a *Batson* challenge, and counsel did not press the issue" even after counsel "questioned the Commonwealth's practice of striking" Black jurors).[6]

Moreover, appellant's derivative claim of appellate counsel ineffectiveness fails because his underlying claim of a *Batson* violation lacks arguable merit. When an appellant has raised a contemporaneous *Batson* objection during jury selection, he "is entitled to the burden-shifting test set forth in that case: '[f]irst, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race[; s]econd, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for his peremptory challenges[; f]inally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.'" *Commonwealth v. Rivera*, 199 A.3d 365, 386 n.16 (Pa. 2018), *quoting Commonwealth v. Simpson*, 66 A.3d 253, 261 (Pa. 2013). "Greater difficulties arise, however, in cases . . . in which there simply was no *Batson* objection raised during the voir dire process to trigger the requisite, contemporaneous inquiry. In such circumstances, where the record was not appropriately focused and channeled at trial, and, concomitantly, the trial court has not been asked to make the necessary findings that would [ ] generate the deference undergirding the *Batson* burden-shifting construct, it is exponentially more difficult to perform a reasoned assessment concerning the presence or absence of purposeful discrimination." *Uderra*, 862 A.2d at 85-86 (internal citation omitted). When this situation arises, "a defendant is not entitled [to] the benefit of *Batson*'s burden-shifting formula, but instead, bears the burden in the first instance and throughout of establishing actual, purposeful discrimination" by a preponderance of the

---

[6] Alternatively, assuming *arguendo* appellant raised a *Batson* claim during jury selection, he subsequently waived the issue by abandoning it on direct appeal. Under this alternate scenario, he could have pursued the preserved *Batson* issue on direct appeal but failed to do so, waiving it for purposes of the PCRA. *See* 42 Pa.C.S. §9544(b).

evidence. *Id.* at 86 (internal citation omitted). Hence, in either situation, whether there has been a contemporaneous objection or not, the defendant bears the burden of proving purposeful discrimination in order to prevail on a *Batson* claim.

Presently, appellant has not carried this burden. Appellant complains of a single peremptory strike of a minority venireperson. There was no pattern of strikes against minorities. The Commonwealth accepted a second minority juror although it had peremptory strikes remaining. *See* PCRA Court Opinion, 7/3/23, at 2; N.T. Voir Dire, 8/29/12, at 684-705. The case was not racially sensitive. Both appellant and the victim share the same race (White). Appellant does not point to any questionable remarks by the Commonwealth during jury selection indicative of racial animus. What's more, the Commonwealth, while disputing it was legally obliged to do so, nonetheless provided a race-neutral explanation for striking Juror 177. Specifically, the Commonwealth explained that based on its review of Juror 177's criminal record, it believed he was not honest in answering his jury questionnaire and lacked responsibility:

> First off, I indicate there is no pattern. There is no pattern for this. So with that being said, you know, I don't feel there's any reason for that rationale, but in terms of the record, I would indicate that in his questionnaire, he indicated no criminal conduct. Review of his criminal record indicates that he recently had an offense other than a traffic offense, which is outlined in there. Also there is a series of driving under suspensions or suspensions that he has had on his record, which we think shows a lack of responsibility in that regard, and, you know, with him not indicating that, you know, either through the questioning or through the questionnaire when asked, we have concern that he is not being honest in his responses to us.

N.T. Voir Dire, 8/29/12, at 683.

Appellant claims the Commonwealth's striking of Juror 177 was pretextual based on the Commonwealth's acceptance of Jurors 52 and 82, both White, despite their own criminal records. But it was not Juror 177's criminal record *per se* which concerned the Commonwealth; it was what this record indicated regarding his truthfulness and ability to act responsibly. Moreover, the criminal records of Jurors 52 and 82 were not similar to

that of Juror 177.[7]  The record for Juror 177 showed a recent, 2011 conviction for public drunkenness.  Juror 52, by contrast, received an accelerated rehabilitative disposition for driving under the influence of alcohol in 1997.  Thus, "[u]nlike Juror 177, around fifteen years had elapsed since this arrest during which Juror 52 had remained arrest and prosecution free."  Commonwealth's Brief at 34.  Juror 82, meanwhile, had a 2011 conviction for disorderly conduct.  This offense, unlike Juror 177's recent offense of public drunkenness, did not involve intoxication.  Alcohol use and inebriation were central issues in appellant's case.  As such, because appellant failed to demonstrate actual, purposeful discrimination by a preponderance of the evidence, his *Batson* ineffectiveness claim fails for lack of merit.

### E. Change of Venire to Lancaster County

Appellant asserts his trial counsel were ineffective for not objecting to the change of venire from Adams County to Lancaster County.   He argues that, pursuant to his own pretrial motion, the venire was properly moved from Adams County because it was saturated with prejudicial news coverage about Officer Grove's death and funeral.  However, he insists the change to Lancaster County was inadequate because Lancaster County is covered by the same television stations as Adams County.  Appellant further alleges voir dire confirmed the Lancaster County jury panel was exposed to the same information, highlighting that 27 potential jurors admitted to hearing about the case through the media or having personal knowledge of the case when being questioned as a group, and another juror indicated previous knowledge of the case during individual voir dire.  Additionally, appellant notes none of the jurors who served on the jury were asked about prior media exposure during individual voir dire even though other potential jurors revealed preexisting biases against him during individual voir dire.  Appellant also claims

---

[7] Appellant attached the docket sheets and docket numbers relating to Jurors 52, 82, and 177 to his PCRA petition.  *See* Amended PCRA Petition, 12/18/18, at 297-327.

trial counsel had no reasonable strategic basis for failing to object to the venire being selected from Lancaster County, and that he was prejudiced by this failure since it resulted in the empanelment of a presumptively prejudicial jury.

The Commonwealth responds by claiming appellant cannot extend the trial court's findings on the change of venire, which specifically named Adams County and the local community, to Lancaster County. While the Commonwealth acknowledges appellant cites several newspaper articles and television broadcasts, it argues appellant fails to point to anything in the record that demonstrates Lancaster County was covered by the same media reporting. *See* Commonwealth's Brief at 38 (faulting appellant for providing no support for "his claim that the pretrial publicity was so extensive, sustained, pervasive and continuing in Lancaster County that the community was saturated with it"). In any event, says the Commonwealth, the passage of time between the media reports and appellant's trial would have dissipated any potential for prejudice, which was confirmed by a review of the voir dire where only 28 of 291 perspective jurors indicated knowledge of the case. In addition, the Commonwealth notes none of the jurors selected for the jury, including alternates, indicated they had prior knowledge of the case, and they all indicated they had not formed an opinion of guilt or innocence. As such, the Commonwealth concludes appellant is unable to prove he was prejudiced by trial counsel's purported failure to object to the change in venire.

In reply, appellant takes issue with the Commonwealth's argument he failed to demonstrate record evidence that Lancaster County was covered by the same media reporting as Adams County. Appellant also suggests the Commonwealth's lapse of time argument is misplaced since the trial court granted a change of venire despite the same amount of time passing between the media reports in Adams County and his trial. Additionally, appellant claims voir dire did establish many potential jurors had preexisting biases against him, many were exposed to media coverage about the case, and none of

the jurors who served were individually questioned about their prior exposure to the case. In sum, appellant contends the same presumption of prejudice that applied to a jury pool from Adams County also applied to Lancaster County such that trial counsel were ineffective for failing to object to the change of venire to Lancaster County.

Regarding change of venire, this Court has stated the following:

The mere existence of pretrial publicity does not warrant a presumption of prejudice. If pretrial publicity occurred, its nature and effect on the community must be considered. Factors to consider are whether the publicity was sensational, inflammatory, and slanted toward conviction rather than factual and objective; whether the publicity revealed the accused's prior criminal record, if any; whether it referred to confessions, admissions, or reenactments of the crime by the accused; and whether such information is the product of reports by the police or prosecuting officers. If any of these factors exists, the publicity is deemed to be inherently prejudicial, and we must inquire whether the publicity has been so extensive, so sustained, and so pervasive that the community must be deemed to have been saturated with it. Finally, even if there has been inherently prejudicial publicity which has saturated the community, no change of venue or venire is warranted if the passage of time has significantly dissipated the prejudicial effects of the publicity.

*Commonwealth v. Bomar*, 826 A.2d 831, 858 (Pa. 2003) (internal quotations and citations omitted). Furthermore, in cases where the claim is based on ineffective assistance of counsel for failing to request change of venire, the actual results of voir dire can lead to the conclusion there was no presumptive prejudice. *See Commonwealth v. Rucci*, 670 A.2d 1129, 1141 (Pa. 1996).

Here, despite his contention that "many potential jurors had preexisting biases against [him]," Appellant's Reply Brief at 24, appellant fails to refute the Commonwealth's assertions, supported by the record, that: only 28 of 291 jurors indicated knowledge of the case during group voir dire; only 14 of the 79 jurors questioned individually expressed any recollection of the news reports; none of the 12 jurors and four alternates chosen to sit on the jury indicated they had any prior knowledge of the case; and all 16 stated they had not formed an opinion of appellant's guilt or innocence. This leads to the conclusion

that the community in Lancaster County was not so saturated with inherently prejudicial publicity as to warrant a presumption of prejudice. *See Commonwealth v. Gorby*, 588 A.2d 902, 907 (Pa. 1991) (no proof of presumptive prejudice where 34 of 70 potential jurors knew something about the case); *Commonwealth v. Casper*, 392 A.2d 287, 295-96 (Pa. 1978) (no proof of presumptive prejudice where one-third of potential jurors had some knowledge of the facts of the case).[8] As appellant is unable to demonstrate presumptive prejudice, his ineffectiveness claim fails for lack of merit.

### F. & G.  Mitigation Evidence

Appellant claims trial counsel were ineffective for failing to present expert testimony at the penalty phase that he would adjust positively to life in prison, such as the testimony of Dr. Cunningham adduced in the PCRA court. He acknowledges trial counsel presented testimony from corrections officers regarding his past and current behavior in prison. However, he contends the impact of that testimony pales in comparison to the mitigation that could have been developed through an expert like Dr. Cunningham, who would have been able to give a detailed presentation as to his opinion on appellant's future behavior in prison. Instead, according to appellant, the jury sentenced him to death based on incorrect assumptions about violence in prison. Appellant posits this claim has arguable merit pursuant to *Skipper v. South Carolina*, 476 U.S. 1 (1986) (approving of penalty phase evidence regarding defendant's probable future conduct), that trial counsel had no reasonable strategic basis for failing to present expert testimony after it was

---

[8] Appellant attempts to save this claim by arguing the trial court's previous finding of presumed prejudice when it granted the original motion for change of venire cannot be refuted by the results of voir dire. *See* Appellant's Reply Brief at 24. This argument is unavailing since the trial court's findings and conclusions pertained to Adams County, not Lancaster County. *See* Trial Court Opinion, 2/2/12, at 4-7. Although both communities may have been exposed to some of the same media reporting, it would be improper to impute the trial court's specific findings regarding one county to an entirely different one it did not consider.

recommended by Dr. Belknap, and prejudice ensued because appellant was sentenced to death by an ill-informed jury.

Appellant also contends trial counsel were ineffective for failing to conduct a thorough investigation of his background, which would have yielded mitigating evidence well beyond the account presented at the penalty phase. Examples of this evidence include the testimony presented at the PCRA hearing reflecting that appellant's mother was sexually abused by her father as a child and the effect of that abuse on appellant, appellant's impoverished and unstable upbringing as a young child, and the extensive history of mental illness in appellant's family. Appellant argues this claim has arguable merit because trial counsel fell far short of conducting a multi-generational investigation into his background as recommended by the American Bar Association Guidelines at the time of his trial and even seemed to ignore the advice of Dr. Belknap. While he acknowledges the evidence trial counsel failed to present at the penalty phase was consistent with the evidence actually presented, appellant claims there was no reasonable strategic basis for failing to conduct a more complete investigation as the additional evidence would have supported and strengthened trial counsel's strategy in the penalty phase and would have provided additional support for the Section 9711(e)(2), (3), and (8) mitigating circumstances. *See* Appellant's Brief at 78-80.

As to prejudice, appellant contends details matter, and the incomplete mitigation evidence failed to convey to the jury the instability and trauma that marked his childhood. *Id.* at 84-85. Although he recognizes trial counsel did conduct some investigation and presented several witnesses, he cites *Sears v. Upton*, 561 U.S. 945, 954 (2010) ("We have never limited the prejudice inquiry under *Strickland* to cases in which there was only little or no mitigation evidence presented.") (internal quotation omitted), as support for his argument that the presentation of some mitigating evidence does not preclude a finding of deficient performance or prejudice. *See id.* at 86.

While the Commonwealth recognizes appellant has suggested alternative avenues trial counsel could have pursued at the penalty phase, it focuses on what trial counsel actually did. The question, on the Commonwealth's telling, is not whether trial counsel could have done more, because it is effectively always the case that counsel could have done something more or differently. Instead, the relevant question is whether the actions trial counsel actually took were within the wide range of reasonable professional assistance. *See* Commonwealth's Brief at 41, *citing Commonwealth v. Wharton*, 811 A.2d 978, 989 (Pa. 2002) (proper focus of ineffectiveness claim is on mitigation case actually presented rather than alternative scenarios proposed on post-conviction review). The Commonwealth argues trial counsel investigated and presented a competent case for mitigation focused on appellant's loving relationship with friends and family, including his daughter, and the substantial impairment he experienced from alcohol consumption. The Commonwealth notes this presentation included both expert and lay witnesses and was partly successful, as demonstrated by the jury's rejection of two aggravating circumstances and its acceptance of the catchall mitigator. In the Commonwealth's view, appellant was not sentenced to death due to trial counsel's performance at the penalty stage but, instead, "due to the substantial — and nearly indisputable — aggravating evidence; that is, [appellant] murdered a law enforcement officer and did so during a felony." *Id.* at 42.

The Commonwealth additionally challenges the testimony provided by Dr. Cunningham and Dr. Toomer as not credible and, in any event, insignificant. Regarding Dr. Cunningham's testimony, the Commonwealth claims the studies he relied on showed that jurors were actually concerned with a capital defendant's future violence if he were released back into the community rather than whether a capital defendant would commit violent crimes in prison. The Commonwealth also believes the jury would have been alienated by the way Dr. Cunningham trivialized the death of Officer Grove.

As to Dr. Toomer, the Commonwealth argues his testimony was similarly incredible, because he diagnosed appellant with PTSD yet failed to point to one instance of trauma appellant allegedly suffered. Lastly, the Commonwealth contends the testimony of Judith Leidig, appellant's aunt, was also inconsequential. It submits her testimony regarding appellant's upbringing was duplicative of evidence presented at the penalty phase and her testimony regarding transgenerational trauma would not have been meaningful, given that the jury had just heard about Officer Grove's life and tragic death. Based on all the above, the Commonwealth concludes appellant failed to prove trial counsel's performance in mitigation rose to the level of ineffectiveness.

In his reply brief, appellant reiterates the arguments from his principal brief regarding the testimony of Dr. Cunningham, and also claims the Commonwealth's arguments on this issue are misplaced because it failed to address the mitigation evidence developed by Dr. Belknap. Finally, appellant argues Dr. Toomer did, in fact, point to instances of trauma — such as his unstable childhood, parental neglect, and exposure to abuse — as the underlying trauma necessary for diagnosing appellant with PTSD.

We first address appellant's claim that trial counsel were ineffective for failing to present expert prison adjustment evidence. As to this claim, it is evident appellant failed to demonstrate he was prejudiced by trial counsel's purported ineffectiveness, which, again, requires a showing of a reasonable probability that the result of the proceeding would have been different had counsel not erred. *See Pierce*, 527 A.2d at 975. In the context of purported ineffectiveness in the presentation of mitigating evidence at the penalty phase of a capital trial, this means a petitioner must show "a reasonable probability that, had the mitigation adduced at the PCRA hearing (and rebutted by the Commonwealth) also been presented at the penalty phase, the outcome of the proceedings would have been different because at least one juror would have found that

the mitigating circumstances collectively outweighed (or were as weighty as) the aggravating circumstances, or to convince a juror to find that the overall quality of the case in mitigation warranted a sentence of life in prison." *Commonwealth v. Daniels*, 104 A.3d 267, 303-04 (Pa. 2014).

Here, at the penalty phase, trial counsel introduced the testimony of Sergeant Garris and Officer Torres of the Adams County Prison, who recounted that appellant was social, cooperative, nonviolent, and respectful in prison. *See* N.T. Trial, 10/3/12, at 1578-80, 1661-64. Thus, the jury was squarely presented with evidence of appellant's positive adjustment to prison. Nonetheless, the jury returned a sentence of death. It is not reasonably probable that more evidence of appellant's positive prison adjustment would have changed the outcome. Even apart from its redundancy, the expert evidence appellant faults counsel for failing to present would not have been persuasive and would have carried scant, if any weight, with the jury. There were multiple weaknesses in his testimony. For instance, the corrections officers who testified on appellant's behalf "actually knew [appellant] and knew there was no assaultive behavior[.]" PCRA Court Opinion, 7/3/23, at 6. Dr. Cunningham, on the other hand, "did not know [appellant] and could not testify if there [w]as any assaultive behavior." *Id.* Also, Dr. Cunningham testified the future dangerousness of a capital defendant is the "elephant in the room" for jurors at the sentencing phase and "jurors are always concerned with that potential regardless of whether it's overtly alleged[.]" N.T. PCRA Hearing, 5/25/22, at 164. However, the studies he relied upon for this conclusion involved jurors who were not given a parole ineligibility instruction and were concerned with a capital defendant's propensity for future violence if released into the community. *See id.* at 235-39. The jurors in appellant's case, in contrast, were specifically instructed that "[u]nder Pennsylvania law, a prisoner who has been convicted of first[-]degree murder and who is serving a sentence of life imprisonment

is not eligible for parole." N.T. Trial, 10/4/12, at 1849.[9] Further, Dr. Cunningham alleged that "[s]erving a life without parole sentence where you might think the person has nothing to lose, that also is not predictive of serious prison violence." N.T. PCRA Hearing, 5/25/22, at 168. Yet, he acknowledged studies showing a significant incidence of violence committed by life-sentenced prisoners. One study showed 39.1% of lifers engaging in assaultive conduct, another 38.7%, and a third 20.7%. *See id.* at 228-29. Given all this, appellant has not demonstrated he was prejudiced by trial counsel's failure to present expert prison adjustment testimony at the penalty stage such that it is reasonably probable at least one juror would have decided against imposing the death penalty. Accordingly, this ineffectiveness claim fails.

Regarding appellant's claim that trial counsel were ineffective for failing to investigate, develop, and present additional mitigation evidence, we agree with the Commonwealth and the PCRA court that trial counsel had a reasonable strategic basis for failing to present such evidence. This Court explained how to determine whether trial counsel's mitigation strategy was reasonable in *Commonwealth v. Lesko*, 15 A.3d 345 (Pa. 2011):

> When evaluating ineffectiveness claims, judicial scrutiny of counsel's performance must be highly deferential. Indeed, few tenets are better settled than the presumption that counsel is effective. This presumption arises from the recognition that it is all too easy for the defendant or the court to second-guess a strategy that has proven unsuccessful. Rather, a reviewing court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's

---

[9] The court further explained: "[t]he only way such a prisoner can obtain a release is by commutation granted by the Governor" following the unanimous recommendation of the Board of Pardons, and "the Governor and the Board of Pardons rarely commute a sentence of life imprisonment." *Id.* at 1849-50.

interests. The U.S. Supreme Court explained a reviewing court's role in making this determination when it stated:

> [t]he court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in a particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland,* 466 U.S. at 690[.]

But, it is also well-settled under the Sixth Amendment that capital counsel has an obligation to conduct a reasonably thorough investigation for mitigating evidence or to make reasonable decisions that make further investigation unnecessary. In evaluating a claim of constitutional deficiency in investigating and presenting mitigation evidence, we consider a number of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the additional or different mitigation evidence that could have been presented. None of these factors is, by itself, dispositive, because even if the investigation conducted by counsel was unreasonable, this fact alone will not result in relief if the defendant cannot demonstrate that he was prejudiced by counsel's conduct.

The U.S. Supreme Court recently clarified the interaction between the performance and prejudice prongs of *Strickland* in instances where there was a finding that counsel's investigation was unreasonable. *See Sears*[, 561 U.S. 945]. In *Sears,* trial counsel employed a mitigation strategy of showing that Sears was from a stable, middle class family, who were shocked and dismayed by his actions and who would be devastated by the imposition of a death sentence. On collateral review, evidence emerged showing that Sears came from an abusive home life, had behavior problems from a very young age, and suffered from "significant frontal lobe abnormalities." *Id.* at [949]. None of this evidence, however, was known to trial counsel, and the state post-conviction court determined that counsel's investigation was inadequate. The state post-conviction court, however, did not grant relief because counsel had presented a mitigation theory with evidence to support it. Thus, the court concluded that Sears had "failed to meet his burden of proving that there is a reasonable likelihood that the outcome at trial would have been different if a different mitigation theory had been advanced." *Id.* at [952] (*citing* state post-conviction court opinion). In vacating the state court, the High Court explained that if the reviewing court determines that counsel's investigation was unreasonable, a "more probing prejudice" inquiry may be necessary, because a finding that counsel had conducted a constitutionally deficient investigation should call into question

the reasonableness of the theory or theories that counsel pursued in mitigation. *See id.* at [953]. Explaining this point further, the Court indicated that pursuing a theory that might be reasonable in the abstract, "does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at whether this particular theory prejudiced [the appellant]. . . . Sears might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not." *Id.*

*Lesko*, 15 A.3d at 186-89 (additional internal citations and quotations omitted).

Just as in *Lesko*, appellant's case "is not an instance where counsel failed to conduct any investigation and presented limited mitigating evidence; nor is it a case where counsel conducted minimal investigation and failed to uncover evidence that was immediately available to him. Instead, it is a case where counsel undertook a reasonable investigation and presented a compelling and partly successful case in mitigation, albeit the defense case did not ultimately carry the day." *Id.* at 189 (internal citations omitted). In fact, the PCRA testimony of Dr. Belknap, the defense mitigation specialist, made clear the defense conducted a thorough pre-trial investigation of potential mitigation. As Dr. Belknap recounted, her research into appellant's background uncovered evidence of childhood poverty, a family history of mental health problems, and transgenerational trauma, all of which she communicated to counsel prior to trial. *See* N.T. PCRA Hearing, 5/24/22, at 120-37 (Dr. Belknap stating she recommended trial counsel retain an expert on trauma and undertake a prison adjustment analysis because she believed appellant growing up impoverished, his family having a history of mental illness, and transgenerational trauma were important factors for mitigation); *see also* N.T. PCRA Hearing, 5/25/22, at 147-53 (Judith Leidig testifying she spoke with Dr. Belknap regarding her family's history of mental illness prior to appellant's trial).

Rather than present this evidence, however, trial counsel decided to focus on appellant's own mental health issues, his lack of an extensive criminal record, and his loving relationship with his daughter. *See* N.T. PCRA Hearing, 5/23/22, at 29-30. In

doing so, trial counsel presented the testimony of 11 lay witnesses, including appellant's family members, friends, neighbors, religious leaders, correctional officers, and his then-fiancé. *See* N.T. Penalty Phase Hearing, 10/3/12, at 1465-1609, 1656-64. Trial counsel also presented the expert testimony of Dr. Hume, who concluded "with reasonable medical certainty [appellant's] mental state was such that, under the statute, he was under the influence of extreme mental or emotional disturbance and that the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." *Id.* at 1636. Also testifying on appellant's behalf at the penalty phase was Dr. Russell, who opined that appellant suffered from depressive mood disorder, which, along with his drinking and substance abuse problems, is the only way to explain why he became violent and killed Officer Grove. *See* N.T. Penalty Phase Hearing, 10/4/12 at 1698-99. This focus on appellant, rather than his family, was partly successful as the jury found the catchall mitigator and rejected two of four aggravating circumstances.[10]

Under these circumstances, where trial counsel, among other things, retained a mitigation specialist, conducted a thorough investigation of appellant's background, developed and presented a robust mitigation defense which included numerous fact witnesses and two mental health experts, and managed at least partial success despite the indisputable presence of the "powerful aggravating circumstance" of the killing of a law enforcement officer in the line of duty, we conclude counsel's performance was constitutionally adequate. *Lesko*, 15 A.3d at 384. To hold otherwise would not accord

---

[10] Although the jury did not find two other mitigating factors alleged by appellant — *i.e.*, he was under an extreme mental or emotional disturbance, and his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired — it is notable that neither Dr. Toomer nor Dr. Cunningham, the experts who testified on appellant's behalf in the PCRA court, believed these mitigators applied to him either. *See* N.T. PCRA Hearing, 5/25/22, at 155-249, N.T. PCRA Hearing, 5/26/22, at 254-313.

"the deference to counsel that *Strickland* commands[.]" *Id.* at 383. Accordingly, because appellant failed to sustain his burden of proving the performance prong of *Strickland*, we reject his claim.

**H. Victim Impact Evidence**

Appellant claims trial counsel were ineffective for not objecting to allegedly improper victim impact evidence. He contends the Commonwealth elicited improper victim impact testimony from Mr. Grove, Officer Grove's father, regarding the emotional impact of his son's death on the community rather than on the victim's family. He further claims Mr. Grove improperly commented on his exercise of his right to a jury trial. He emphasizes counsel failed to object to this testimony even after the trial court warned the Commonwealth of the impropriety of Mr. Grove's testimony. Appellant further notes counsel never requested a curative instruction and argues there was no reasonable strategic basis for either failure. Prejudice ensued, in appellant's view, because the jury was left to weigh his life against the impact of Officer Grove's life on an entire community and the impact that exercising his constitutional right to a jury trial had on Officer Grove's family. In conclusion, appellant claims the PCRA court's finding that there was no testimony about the impact on the community is unsupported by the record.

The Commonwealth responds by arguing Mr. Grove's testimony was wholly admissible because 42 Pa.C.S. §9711(a)(2) allows evidence regarding "any other matter" to be admitted within the discretion of the trial court. *See* Commonwealth's Brief at 48. In further support of this proposition, the Commonwealth points to *Commonwealth v. Means*, 773 A.2d 143 (Pa. 2001). According to the Commonwealth, *Means* relied on *Payne v. Tennessee*, 501 U.S. 808 (1991), which stressed the relevance of victim impact evidence "as such information conveys to the jury that the decedent was a unique individual whose loss affects **society**" and stated, "by the act of murder, it was reasonably foreseeable that the defendant took from **society** the value of a unique life in being." *Id.*

at 48-49, *quoting Payne*, 501 U.S. at 825 (emphasis supplied by the Commonwealth). In the Commonwealth's view, *Means* stands for the principle that the loss of a life may affect society as a whole and a trial judge may rule testimony relating to that loss is relevant and admissible. As it believes the underlying claim of impropriety is meritless, the Commonwealth takes the position that trial counsel cannot be held ineffective for failing to raise a meritless claim.

In his reply brief, appellant claims the Commonwealth's broad reading of Section 9711(a)(2) ignores the constitutional protections of the Eighth Amendment and the narrow exception recognized in *Payne*. He further argues the Commonwealth is misrepresenting the holding of *Means*. As appellant reads it, *Means* held Section 9711(a)(2) does not allow generalizations concerning the effect of the victim's death on the community at large. Appellant thus believes Mr. Grove's testimony exceeded the bounds of the Eighth Amendment as interpreted in *Payne*, and trial counsel were ineffective for failing to object to his testimony.

The Supreme Court of the United States has held victim impact evidence "relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family" is permissible in capital cases under the Eighth Amendment to the United States Constitution. *Payne*, 501 U.S. at 817. The portion of Section 9711 dealing with victim impact evidence tracks this holding and states, "information concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible." 42 Pa.C.S. §9711(a)(2). Consequently, our caselaw reviewing the admissibility of victim impact evidence considers the constitutional limitations on such evidence. We turn now to a few of those decisions.

In *Commonwealth v. Eichinger*, 915 A.2d 1122 (Pa. 2007), we explained our rubric for reviewing claims of improper victim impact evidence in capital cases:

In [*Means*], this Court set out clear guidelines for victim impact statements in death cases. We held that Pennsylvania jurisprudence favors the introduction of all relevant evidence during a capital sentencing proceeding and that our sentencing scheme does not limit this evidence in the penalty phase to only the information necessary to establish aggravating and mitigating circumstances. Further, we held that our trial judges are more than capable of overseeing the presentation of evidence so that overtly passionate, intentionally biased and inflammatory material is kept out of the courtroom. Victim impact testimony is permissible when the Commonwealth establishes that the victim's death had an impact on the victim's family as opposed to presenting mere generalizations of the effect of the death on the community at large. Once this threshold has been met, the trial court has discretion over the testimony admitted.

When a court comes to a conclusion through the exercise of discretion, there is a heavy burden to show that this discretion has been abused. It is not sufficient to persuade the appellate court that it might have reached a different conclusion, it is necessary to show an actual abuse of the discretionary power. An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. Absent an abuse of that discretion, we will not disturb the ruling of the trial court.

*Id.* at 1139-40 (internal citations omitted). Furthermore, in *Commonwealth v. Hitcho*, 123 A.3d 731 (Pa. 2015), "we emphasi[zed] that, although the evidence that is the subject of Section 9711(a)(2) has been generally labeled victim impact evidence, it is important to note that the text of the statute explicitly refers to two types of evidence or information: concerning (1) the victim and (2) the impact that the death has had on the family of the victim." *Id.* at 761 (internal citation, quotations, and brackets omitted). In this vein, this Court has allowed testimony regarding a victim's personal characteristics and good qualities as a police officer. *See Commonwealth v. Flor*, 998 A.2d 606, 636 (Pa. 2010); *see also Commonwealth v. Singley*, 868 A.2d 403, 415 (Pa. 2005). Inquiry into these topics is proper under Section 9711(a)(2) and in perfect harmony with *Payne*'s recognition that evidence "relating to the personal characteristics of the victim and the emotional

impact of the crimes on the victim's family" is permissible in capital cases under the Eighth Amendment. *Payne*, 501 U.S. at 817.

Properly considered in light of these precedents, we discern no reversible error in the introduction of Mr. Grove's testimony. Appellant challenges three portions of his testimony: (1) the overwhelming nature of making the funeral arrangements; (2) his story about a mother and young boy who came to the funeral; and (3) his statement regarding his lack of closure. We take each of these in turn.

Appellant first claims Mr. Grove testified regarding the community's response to Officer Grove's death as "overwhelming." Appellant's Brief at 90. However, a review of the record shows Mr. Grove was speaking about how he was overwhelmed that he had to plan his son's funeral. *See* N.T. Trial, 10/3/12, at 1459 ("it was such a monumental task to arrange this, but through all the law enforcement communities and Game Commission they made things a lot easier, but it was still so overwhelming"). Read in context, this statement undoubtedly goes to the effect of Officer Grove's death on his family and was admissible testimony.

Second, while appellant argues Mr. Grove's story about the young boy was an "extended personal anecdote about Officer Grove's effect on a non-family member[,]" Appellant's Brief at 89, it is plain this testimony instead concerned the personal characteristics of Officer Grove and his good characteristics as a Game Officer. This is evident from the remark Mr. Grove made immediately after telling that story: "I seen him he used to deal with some youngsters that age he would care about and the kids loved him, they really did." N.T. Trial,, 10/3/12, at 1458. We therefore conclude this testimony was admissible pursuant to *Hitcho*, *Flor*, and *Singley*.

Finally, the Commonwealth did, at first, ask Mr. Grove how the criminal justice system and "the last several weeks" (meaning the trial) impacted his family. N.T. Trial,

10/3/12, at 1461. However, trial counsel objected to that question and the trial court sustained the objection. *See id.* at 1461-62. The following exchange then took place:

> **[Commonwealth]:** Mr. Grove, the fact that both you and your wife are now the parents of a law enforcement officer who was murdered in the line of duty, can you just tell us how that fact has impacted you and your wife?
>
> **[Mr. Grove]:** Well, I mean he's still our son and we still grieve and through all of this basically there's not been closure like we would think of normally for a family and it's a constant grieving. It's dealing with all the details up to this point [that] has been sometimes stressful and trying.

*Id.* at 1463. The Commonwealth's question was unequivocally focused on the impact of being the parents of a slain law enforcement officer. Moreover, the phrases "all of this" and "the details up to this point" in Mr. Grove's response are vague and could have referred to many things, including the overwhelming nature of handling his son's funeral arrangements, the funeral itself, the media coverage, and, of course, the legal proceedings. Importantly, though, Mr. Grove never explicitly mentioned the trial. Under these circumstances, it is quite a stretch to say those portions of his response were inadmissible as an improper comment on appellant's constitutional right to a jury trial. This claim fails for lack of merit.[11]

## I. Cumulative Prejudice

In his final claim, appellant contends the cumulative effect of the above errors denied him a fair trial and the heightened procedural safeguards constitutionally required in capital cases. In doing so, appellant claims there is a reasonable probability that at

---

[11] As we conclude Mr. Grove's testimony was proper under the unambiguous language of Section 9711(a)(2) — which, again, mirrors *Payne*'s articulation of the limits imposed by the Eighth Amendment on the introduction of victim impact statements in capital cases — we need not address the Commonwealth's broader reading of the statute as also permitting victim impact testimony relating to society in general. The testimony as issue here is simply not of that kind.

least one juror would have weighed the aggravating and mitigating circumstances differently had they known of Laumann's implicit agreement with the Commonwealth, heard the prison adjustment and additional mitigation evidence, and been precluded from hearing the improper victim impact testimony.

In response, the Commonwealth contends appellant's claims are individually meritless and, thus, our caselaw precludes a finding that he is entitled to relief on the cumulative effect of the alleged errors. *See* Commonwealth's Brief at 49-50, *quoting Commonwealth v. Sepulveda*, 55 A.3d 1108, 1150 (Pa. 2012) ("no number of failed claims may collectively warrant relief i[f] they fail to do so individually").

Appellant replies by noting that while *Sepulveda* applies to claims that fail for lack of merit, it does not apply to meritorious claims that fail for lack of prejudice. He argues this Court may find cumulative prejudice from all his meritorious claims of trial counsel's ineffectiveness and the Commonwealth's constitutional violations. *See* Appellant's Reply Brief at 36-37, *citing Commonwealth v. Spotz*, 18 A.3d 244, 321 (Pa. 2011).

This Court has stated on numerous occasions that "no number of failed claims may collectively warrant relief i[f] they fail to do so individually." *Sepulveda*, 55 A.3d at 1150, *quoting Commonwealth v. Rainey,* 928 A.2d at 245. But we have also acknowledged that "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation." *Id.*, *quoting Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009). **"For there to be cumulation, however, there must be errors with significant prejudicial effect."** *Commonwealth v. Brown*, 196 A.3d 130, 191 (Pa. 2018). As described at length throughout this opinion, we have found the great majority of appellant's individual claims lack merit. Moreover, "to the extent we have reached the prejudice prong in our consideration of any of his ineffectiveness claims, we are satisfied that, even if cumulated, appellant is not entitled to relief." *Commonwealth v. Johnson*, 289 A.3d 959, 1053 (Pa. 2023).

## IV. Conclusion

For the foregoing reasons, we hold the PCRA court properly denied appellant's petition for post-conviction relief.  Accordingly, we affirm.

Chief Justice Todd and Justices Donohue, Wecht, Mundy, Brobson and McCaffery join the opinion.